FILED
United States Court of Appeals
Tenth Circuit

April 4, 2011

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

No. 10-5065

KENNETH FRANK MCHUGH,

Defendant-Appellant.

**Appeal from the United States District Court
for the Northern District of Oklahoma
(D.C. No. 4:09-CR-00141-TCK-1)**

Submitted on the briefs:

Thomas Scott Woodward, United States Attorney, and Joel-lyn Alicia McCormick, Assistant United States Attorney, Northern District of Oklahoma, for Plaintiff-Appellee.

Julia L. O'Connell, Federal Public Defender, Amanda M. Folsom, Assistant Federal Public Defender, and Barry L. Derryberry, Research and Writing Specialist, Office of the Federal Public Defender, Northern District of Oklahoma, for Defendant-Appellant.

Before **O'BRIEN**, **SEYMOUR**, and **HOLMES**, Circuit Judges.[*]

---

[*] After examining the appellate record, this three-judge panel determined unanimously that oral argument would not be of material assistance in the determination of this appeal. *See* Fed. R. App. P. 34(a); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

**HOLMES**, Circuit Judge.

_____

Kenneth Frank McHugh conditionally pleaded guilty to possession of a firearm and ammunition by a felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), reserving his right to appeal the district court's previous denial of his motion to suppress evidence. Mr. McHugh now appeals that denial, arguing that his Fourth Amendment rights were violated because the officer that detained him lacked reasonable suspicion to justify the investigatory stop. Exercising jurisdiction under 28 U.S.C. § 1291, we **AFFIRM** the district court's denial of Mr. McHugh's motion to suppress.

## BACKGROUND[1]

At approximately 2:00 a.m. on September 15, 2009, Benjamin Terrero—the armed security officer employed by the Observation Point apartment complex in Tulsa, Oklahoma—was on "night watch" at the property. Mr. Terrero had been hired to enforce a 10:00 p.m. curfew at the apartment complex, which had been instituted in response to a rise in criminal activity in the area. While patrolling the parking lot in his security vehicle, Mr. Terrero observed two white males within the complex; when the individuals saw Mr. Terrero, they "acted very suspicious." R., Vol. III, at 12–13 (Suppression Hr'g Tr., dated Jan. 7, 2010). One of the men, later identified as Mr. McHugh, "recognized [Mr. Terrero's] vehicle and ran toward a golden colored Impala that was parked in front

_____

[1]     As also noted below, "[i]n reviewing the district court's ruling on the motion to suppress, we view the evidence in the light most favorable to the government." *United States v. Poe*, 556 F.3d 1113, 1121 (10th Cir.), *cert. denied*, 130 S. Ct. 395 (2009).

2

of" one of the apartment buildings. *Id.* at 13. Mr. Terrero observed the other male "ducking in between cars . . . trying to get to th[e] passenger side of [the Impala]." *Id.*

After the two men got inside, Mr. Terrero pulled his vehicle behind the Impala and shined his spotlight on it. Mr. Terrero then approached the car to question the men. Mr. McHugh, who was in the driver's seat, told Mr. Terrero "that he was there to pick up his friend [who had] passed out inside of his vehicle"; Mr. McHugh's companion, who had just been seen ducking through the parking lot, was pretending to be unconscious in the passenger's seat. *Id.* at 14. Mr. Terrero testified that during this interaction Mr. McHugh "was trying to conceal something with his right hand . . . between the driver's side seat and the center console." *Id.* at 14–15. Mr. Terrero asked Mr. McHugh to "keep his hands where [he] could see them," but Mr. McHugh repeatedly went "back to trying to conceal his right hand." *Id.* at 15.

At that point, Mr. McHugh's "friend" pretended to wake up and attempted to exit the vehicle. In response, Mr. Terrero went to the passenger side of the vehicle and kicked the door shut. Mr. Terrero noticed a screwdriver and a hammer in the vehicle, which he stated "are the kinds of tools people use to break into people[']s cars." *Id.* at 15–16. Then, when Mr. McHugh "became agitated" and "insisted [o]n getting out of the vehicle," Mr. Terrero sprayed him with pepper spray. *Id.* at 16. Mr. Terrero then pulled his firearm and held the two men at gunpoint while he called 9-1-1. He reported to the police dispatcher that he was detaining two subjects at gunpoint and that he believed they had a gun in their vehicle. Mr. Terrero continued holding the men at gunpoint while he

3

waited for the police to arrive.

Two Tulsa police officers—Officer Oakes and Officer Brisbin—were dispatched to the scene in response to Mr. Terrero's 9-1-1 call. The dispatcher informed the officers that "the security officer . . . had two subjects at gunpoint that [were] . . . suspected to have a weapon in the car." *Id.* at 30. Officer Oakes testified that this was not unusual because over the past ten to fifteen years he had been called to the complex many times before for "[a]nything from domestics to burglaries to just about everything," and, more specifically, in the "weeks" and "months prior to September 15th" he had responded to calls for "domestics and car burglar[ies] and that type of deal." *Id.* at 29.

Upon arrival, the officers "observed the security officer behind the car with his lights on it and pointing his gun at the car and the two subjects in the car." *Id.* at 31. Before Officer Oakes approached the Impala, Mr. Terrero told the officer that "the two subjects had been seen lurking through the complex, that . . . they were acting hinky on him," "that when he approached them he just felt uneasy," and "that they were not obeying his commands." *Id.* at 31, 34. Officer Oakes then approached the driver's side of the vehicle and "commanded the driver to reach out and open his door and to start backing out towards the back of the car." *Id.* at 31. The officer stated that he did this as a "safety precaution[]." *Id.* at 32. Mr. McHugh obeyed this command, and "[a]s he stepped out of the car he advised [the officer] that he had a gun," but did not state where it was. *Id.* At that time—after Mr. McHugh admitted that he was armed—Officer Oakes handcuffed Mr. McHugh, patted him down, and located a revolver in his back pocket.

4

On November 2, 2009, Mr. McHugh was charged with one count of possession of a firearm and ammunition by a felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), based on the gun and ammunition seized by Officer Oakes at the apartment complex. Mr. McHugh moved to suppress this evidence, arguing that the initial detention and subsequent search violated the Fourth Amendment. The district court denied the motion, based on its conclusions that: (1) the actions of Mr. Terrero—as a private individual—could not be attributed to the government for purposes of the Fourth Amendment analysis; (2) the initial seizure of Mr. McHugh did not violate the Fourth Amendment because the totality of the circumstances established that the officers had a reasonable suspicion that Mr. McHugh may have been involved in criminal activity; and (3) the pat-down of Mr. McHugh did not violate the Fourth Amendment because the officers had a reasonable suspicion that he was armed and dangerous and the pat-down was not excessive in scope.

Following the district court's denial of his motion to suppress, Mr. McHugh conditionally pleaded guilty to the felon-in-possession charge, reserving his right to appeal the district court's denial of his motion. The district court sentenced Mr. McHugh to sixty months' imprisonment, followed by a term of three years of supervised release. Mr. McHugh then filed this timely appeal.

## STANDARD OF REVIEW

In reviewing the district court's denial of a motion to suppress, "we review the court's factual findings for clear error and view the evidence in the light most favorable to

the government." *United States v. Worthon,* 520 F.3d 1173, 1178 (10th Cir. 2008).

"[W]e review de novo the ultimate determination of reasonableness under the Fourth

Amendment." *United States v. Thompson*, 524 F.3d 1126, 1132 (10th Cir. 2008); *see also*

*United States v. Thomson*, 354 F.3d 1197, 1199–1200 (10th Cir. 2003) ("We review *de*

*novo* the district court's legal conclusion concerning whether a Fourth Amendment

violation occurred.").

## DISCUSSION

The single issue presented on appeal is whether the police officer's initial

investigatory detention of Mr. McHugh was reasonable under the Fourth Amendment.[2]

The Fourth Amendment protects individuals from "unreasonable searches and seizures,"

U.S. Const. amend. IV, including unreasonable "investigatory stop[s]" or detentions.

*United States v. Simpson*, 609 F.3d 1140, 1146 (10th Cir. 2010).  In *Terry v. Ohio*, the

Supreme Court established that a law enforcement officer "may in appropriate

circumstances and in an appropriate manner approach a person for purposes of

investigating possibly criminal behavior even though there is no probable cause to arrest."

*United States v. Treto-Haro*, 287 F.3d 1000, 1004 (10th Cir. 2002) (quoting *Terry*, 392

---

[2]     On appeal, Mr. McHugh does not challenge the district court's holdings that (1) "the actions of [Mr.] Terrero should [not] be attributed to the Government," R., Vol. I, at 28 (Dist. Ct. Op. and Order, dated Jan. 11, 2010); and (2) the pat-down of Mr. McHugh—after he stated that he had a gun—was "necessary in order to adequately ensure officer safety" and was not "excessive in scope," *id.* at 30–31.  Therefore, the only issue before the court on appeal is whether the initial detention violated the Fourth Amendment.

6

U.S. 1, 22 (1968)) (internal quotation marks omitted).  An investigatory detention "is justified at its inception if 'the specific and articulable facts and rational inferences drawn from those facts give rise to a reasonable suspicion a person has or is committing a crime.'"  *United States v. DeJear*, 552 F.3d 1196, 1200 (10th Cir.) (quoting *United States v. Werking*, 915 F.2d 1404, 1407 (10th Cir. 1990)), *cert. denied*, 129 S. Ct. 2418 (2009); *see also United States v. Sokolow*, 490 U.S. 1, 7 (1989) ("[T]he police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion . . . that criminal activity 'may be afoot,' even if the officer lacks probable cause." (quoting *Terry*, 392 U.S. at 30)).[3]  Although "[r]easonable suspicion requires the officer to act on 'something more than an inchoate and unparticularized suspicion or hunch,'" *United States v. Hauk*, 412 F.3d 1179, 1186 (10th Cir. 2005) (quoting *Sokolow*, 490 U.S. at 7), "the level of suspicion required for reasonable suspicion is 'considerably less' than proof by a preponderance of the evidence or that required for probable cause," *United States v. Lopez*, 518 F.3d 790, 799 (10th Cir. 2008) (quoting *Sokolow*, 490 U.S. at 7).

In determining whether reasonable suspicion exists, we look to the "totality of the circumstances," rather than assessing each factor or piece of evidence in isolation.  *United*

---

[3]     Under the Fourth Amendment, the determination of whether an investigatory detention is constitutional requires a two-step analysis—the detention "is reasonable if it is (1) 'justified at its inception' and (2) 'reasonably related in scope to the circumstances which justified the interference in the first place.'"  *DeJear*, 552 F.3d at 1200 (quoting *United States v. Johnson*, 364 F.3d 1185, 1189 (10th Cir. 2004)).  On appeal, Mr. McHugh only challenges whether the detention was justified at its inception. *See* Aplt. Principal Br. at 1, 6.

*States v. Salazar*, 609 F.3d 1059, 1068 (10th Cir. 2010). Additionally, we "need not rule out the possibility of innocent conduct," *United States v. Arvizu*, 534 U.S. 266, 277 (2002)), and reasonable suspicion may exist "even if it is more likely than not that the individual is *not* involved in any illegality," *United States v. Albert*, 579 F.3d 1188, 1197 (10th Cir. 2009) (emphasis added) (quoting *Johnson*, 364 F.3d at 1194) (internal quotation marks omitted). "All reasonable suspicion requires is 'some minimal level of objective justification.'" *Id.* (quoting *Sokolow*, 490 U.S. at 7).

Furthermore, when determining if a detention is supported by reasonable suspicion, we "defer to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions." *United States v. Zubia-Melendez*, 263 F.3d 1155, 1162 (10th Cir. 2001) (internal quotation marks omitted). We "judge the officer's conduct in light of common sense and ordinary human experience," *United States v. Mendez*, 118 F.3d 1426, 1431 (10th Cir. 1997), and "we consider the reasonableness of an officer's actions using an 'objective standard,'" *United States v. Winder*, 557 F.3d 1129, 1134 (10th Cir.) (quoting *United States v. Sanchez*, 519 F.3d 1208, 1213 (10th Cir. 2008)), *cert. denied*, 129 S. Ct. 2881 (2009). The detaining officer's "'subjective beliefs and intentions' are, quite simply, irrelevant." *Id.* (quoting *United States v. DeGasso*, 369 F.3d 1139, 1143 (10th Cir. 2004)). Under this objective standard, we ask "whether 'the facts available' to the detaining officer, at the time, warranted an officer of 'reasonable caution' in believing 'the action taken was appropriate.'" *Id.* (quoting *Terry*, 392 U.S. at 21–22).

8

In this case, it is undisputed that Mr. McHugh was detained or "seized" for Fourth Amendment purposes when Officer Oakes ordered him to exit the vehicle and he obeyed this command. *See, e.g.*, *Salazar*, 609 F.3d at 1064 ("When an officer does not apply physical force to restrain a suspect, a Fourth Amendment seizure occurs only if (a) the officer shows his authority; and (b) the citizen 'submit[s] to the assertion of authority.'" (alteration in original) (quoting *California v. Hodari D.*, 499 U.S. 621, 625–26 (1991))). Here, the district court held that the detention was justified at its inception because the "facts as a whole" established "a reasonable and articulable suspicion that [Mr. McHugh] might be involved in criminal activity." R., Vol. I, at 29. The factors considered by the district court, and asserted by the government on appeal, include (1) that the activity occurred at a late hour—2:00 a.m.; (2) that the "officers were aware that the complex had been the site for criminal activity in recent weeks and months"; (3) that "[d]ispatch . . . [had] informed the officers that the subjects were suspected to have a weapon in the car"; and (4) that Mr. Terrero had conveyed to the officers that "the men had been lurking in the complex, made him feel uneasy, were acting 'hinky,' were not obeying his commands, and attempted to exit the vehicle despite his orders." *Id.* We agree with the district court that the facts, viewed in their entirety and in the light most favorable to the government, establish that reasonable suspicion existed to justify the stop.

Although the fact that a stop occurred in a high-crime area cannot alone justify a *Terry* stop—that is, cannot by itself serve to establish "reasonable suspicion"—courts have repeatedly held that such a characteristic of the location of the stop is relevant to the

9

analysis and may be taken into consideration. *See, e.g.*, *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("[O]fficers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation."); *DeJear*, 552 F.3d at 1201 ("[T]he fact that conduct occurs in an area known for criminal activity [is an] appropriate factor[] to consider in determining whether reasonable suspicion exists."). The officers in this case were fully aware that the area in question was known for criminal activity. Officer Oakes, in particular, had been responding to calls regarding possible criminal activity in the Observation Point apartment complex for "[t]he past 10, 15 years," and had been dispatched to the apartment complex on several occasions in the "couple of months" prior to Mr. McHugh's arrest. R., Vol. III, at 29 (stating that the officer had responded to calls at the apartment complex for "domestics," "burglaries," and "just about everything").

We have likewise held that the fact that an incident occurred late at night or early in the morning is relevant to the *Terry* analysis. *See United States v. Clarkson*, 551 F.3d 1196, 1202 (10th Cir. 2009) (stating that the fact that it was "late at night" was a consideration that has been "recognized by this court as supporting reasonable suspicion"); *Gallegos v. City of Colo. Springs*, 114 F.3d 1024, 1029 (10th Cir. 1997) (stating that "the time of night," which happened to be around 1:00 a.m., was factored into the court's decision that reasonable suspicion existed). The incident in question occurred around 2:00 a.m., which is undoubtedly late enough (or early enough) to be a factor in the reasonable suspicion assessment. Accordingly, the district court was correct

in considering both of these factors—the criminal history of the area and the early hour of the morning—in reaching its conclusion that reasonable suspicion existed.

The information relayed to the officers—both directly from Mr. Terrero and through the dispatch report—is also relevant. The police dispatch had informed the officers that the subjects were "suspected to have a weapon in the car." R., Vol. III, at 30. Although this piece of information, standing alone, does not establish reasonable suspicion, it is relevant when assessing the evidence as a whole, and the court was correct to consider it.

It is also relevant that the officers were informed by Mr. Terrero, before the stop, that the men were "lurking" around the parking lot, were acting "hinky," were not obeying the armed security guard's commands, and were trying to exit the vehicle despite the guard's orders to the contrary. This suspicious behavior on the part of Mr. McHugh (along with that of his compatriot) only adds to the "reasonable suspicion" calculus. It does not matter in this instance that the police did not observe this behavior first hand. The Supreme Court, in *Adams v. Williams*, rejected the theory that "reasonable cause for a stop and frisk can only be based on [an] officer's personal observation, rather than on information supplied by another person." 407 U.S. 143, 147 (1972). When the relevant information comes from a third party, the appropriate issue is whether that information, which the police officer relied upon in acting, possessed sufficient "indicia of reliability." *Id.* In this case, it cannot be said that the information provided by Mr. Terrero was unreliable. As Officer Oakes testified, he knew Mr. Terrero, had "dealt with [Mr.

11

Terrero] for several years," and knew that Mr. Terrero was familiar with these situations because the experienced security guard had "f[ound] a lot of people dealing drugs in the complexes that he works and stuff like that." R., Vol. III, at 35. Put differently, this is not a situation where the police were dealing with an anonymous tip; Mr. Terrero is more akin to a known informant. *See Adams*, 407 U.S. at 146 (permitting an officer to rely on information from an "informant [who] was known to him personally and [who] had provided him with information in the past," which presented "a stronger case than obtains in the case of an anonymous telephone tip"). Accordingly, it was not improper for the police officers to rely on the report of Mr. Terrero, a security officer with whom they had a pre-existing relationship and who they knew had experience in dealing with similar situations.

Mr. McHugh argues that his "efforts to oppose [Mr. Terrero's] orders and his attempt to seize [him] cannot be viewed as indicators of criminal behavior," given that Mr. Terrero was a private citizen—rather than a law enforcement officer—and, therefore, "had no lawful basis for seizing Mr. McHugh." Aplt. Principal Br. at 10–13. It is well-settled that "nervous, evasive behavior," including fleeing from law enforcement, "is a pertinent factor in determining reasonable suspicion." *Wardlow*, 528 U.S. at 124; *see also DeJear*, 552 F.3d at 1201 ("Furtive movements, nervousness, and the fact that conduct occurs in an area known for criminal activity are all appropriate factors to consider in determining whether reasonable suspicion exists."). However, because Mr. Terrero was not a law enforcement officer, Mr. McHugh suggests that his behavior in

12

response to Mr. Terrero's presence and authority cannot be taken into consideration. We disagree. Although Mr. McHugh's furtive, evasive, and defiant conduct may not have been as indicative of possible criminal activity in relation to Mr. Terrero as it would have been if he had undertaken the same conduct in front of an actual law enforcement officer, it is still relevant. Specifically, Mr. Terrero was an armed security guard with an authoritative presence in the complex, whose patent objective was in part to prevent crime. Thus, he was more akin to a law enforcement officer than an apartment tenant or casual passerby who happened to be strolling through the parking lot. Therefore, Mr. McHugh's behavior in response to Mr. Terrero's presence and questioning is relevant to the reasonable suspicion analysis.

Mr. McHugh also notes in his appellate brief that the evidence known to the officers was "not indicative of a crime *in the estimation of Officer Oakes*," because, "as Officer Oakes admitted, *he had no reason to think* that [Mr.] McHugh had committed any crime." Aplt. Principal Br. at 15–16, 19 (emphasis added). However, as discussed above, Officer Oakes's subjective beliefs are irrelevant; the standard we apply is an objective one. *See Winder*, 557 F.3d at 1134 ("[W]e consider the reasonableness of an officer's actions using an 'objective standard.'" (quoting *Sanchez*, 519 F.3d at 1213)); *DeGasso*, 369 F.3d at 1143 (stating that an officer's "actual motivations or subjective beliefs and intentions" are irrelevant). Therefore, any suggestion that Officer Oakes's subjective beliefs and thoughts are relevant is misplaced.

In sum, we hold that reasonable suspicion existed to justify the investigatory stop

13

at its inception. That is, we conclude that "'the facts available' to [Officer Oakes], at the time, warranted an officer of 'reasonable caution' in believing 'the action taken was appropriate.'" *Winder*, 557 F.3d at 1134 (quoting *Terry*, 392 U.S. at 21–22). This is clearly not "a case of police officers arbitrarily stopping an individual walking down the sidewalk during the middle of the afternoon." *Gallegos*, 114 F.3d at 1029; *see also Brown v. Texas*, 443 U.S. 47, 52 (1979) (finding no justification for *Terry* stop when "the appellant's activity was no different from the activity of other pedestrians in that neighborhood").[4] Accordingly, the district court did not err in denying Mr. McHugh's motion to suppress.

## CONCLUSION

Based on the foregoing analysis, we **AFFIRM** the district court's denial of Mr. McHugh's motion to suppress.

---

[4] Mr. McHugh cites *Brown* in support of his position that no reasonable suspicion existed in this instance. However, in *Brown*, the only factors identified in support of the officer's stop of the subject were that he "looked suspicious," and that he was "in a neighborhood frequented by drug users." 443 U.S. at 52. Furthermore, it was 12:45 in the afternoon and there was "no indication . . . that it was unusual for people to be in the alley." *Id.* at 48, 52. *Brown* is easily distinguished from the case at bar, where it was 2:00 a.m., the officers had reason to believe Mr. McHugh had a weapon, and the officers had been informed that the subjects had been furtive, evasive, and defiant when confronted by an armed security guard hired to patrol the complex. Unlike in *Brown*—where the subject's "activity was no different from the activity of other pedestrians in that neighborhood," *id.* at 52—the officers in this case had sufficient reason to believe that Mr. McHugh and the other male subject may have been involved in criminal behavior.

10-5065 *United States v. McHugh*
**O'BRIEN**, J., concurring.

I agree with the result reached by the majority and do not quarrel with its resolution of the arguments presented.[1] My point of departure is with the acceptance of McHugh's argument that a "reasonable suspicion of criminal activity" is a necessary requirement in this case. Defining the issue is the first step of the analysis; that issue is public safety, not criminal investigation. The officer's ultimate goal may have been to investigate possible criminal behavior, but upon arriving at the scene that ultimate goal was at least temporarily eclipsed by a more pressing and immediate need (and the matter at issue here) – to insure public safety. The exquisitely narrow issue is whether Officer Oakes could, without violating the Fourth Amendment, require McHugh to get out of his vehicle whether or not there was a reasonable and articulable suspicion that McHugh or his companion had committed or were about to commit a crime. The broader principles of *Terry* guide our decision; we "first . . . focus upon the governmental interest which allegedly justifies official intrusion" and next consider whether the "articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, 20-21 (1968). In applying those principles, we must recognize the multiple roles assigned to law enforcement officers.

---

[1] This is one of those instances where we ought not to engage the issue as the parties have framed it because they have obscured, rather than observed, guiding precedent. We can, and should in this case, affirm on the different grounds I outline; grounds fully supported by the record. *See Richison v. Ernest Grp., Inc.*, --- F.3d ---, No. 09-6301, 2011 WL 856271 at *5 (10th Cir. March 14, 2011) ("We have long said that we may affirm on any basis supported by the record, even if it requires ruling on arguments not reached by the district court or even presented to us on appeal.").

By design or default, the police are also expected to reduce the opportunities for the commission of some crimes through preventative patrol and other measures, aid individuals who are in danger of physical harm, assist those who cannot care for themselves, **resolve conflict**, create and maintain a feeling of security in the community, and provide other services on an emergency basis.

3 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 6.6 (4th ed.) (emphasis added)). The public safety exception to the search warrant requirement found its genesis in *Wayne v. United States*, where then Judge Burger wrote:

[A] warrant is not required to break down a door to enter a burning home to rescue occupants or extinguish a fire, **to prevent a shooting** or to bring emergency aid to an injured person. The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency."

318 F.2d 205, 212 (D.C. Cir. 1963) (emphasis added). "[T]he business of policemen and firemen is to act, not to speculate or meditate on whether the report is correct." *Id.* This principle was reflected in *Mincey v. Arizona*, another search case. 437 U.S. 385, 392 (1978). And again in *Brigham City, Utah v. Stuart,* where it was said, "Nothing in the Fourth Amendment required [officers] to wait until another blow rendered someone 'unconscious' or 'semi-conscious' or worse before entering. The role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties; . . ." 547 U.S. 398, 406 (2006) (Warrantless police entry into a home to stop a fight). And yet again in *Michigan v. Fisher*, where the Court wrote: "Officers do not need ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception." 130 S. Ct. 546, 549 (2009) (Warrantless police entry into a home

2

prompted by demonstrated violence against property and potential risk to persons). The Court there explained: "It does not meet the needs of law enforcement or the demands of public safety to require officers to walk away from a situation like the one they encountered here. Only when an apparent threat has become an actual harm can officers rule out innocuous explanations for ominous circumstances." *Id.* It does not serve us well to restrict these guiding principles to searches; the compelling reasons for immediate police action do not lose their force simply because a person is temporarily seized (rather than searched) in order to bring a dangerous circumstance under control pending a dispassionate investigation. Indeed, both *Brigham City* and *Fisher* involved not merely warrantless entries into a <u>home</u>, but also seizures of individuals within the home.

The Supreme Court has repeatedly said, "the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Bringham City*, 547 U.S. at 403. (citations omitted). "An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed objectively, justify the action." *Id*. at 404 (quotations omitted). Reasonableness is, of course, highly fact sensitive. "[W]e have treated reasonableness as a function of the facts of cases so various that no template is likely to produce sounder results than examining the totality of circumstances in a given case; it is too hard to invent categories without giving short shrift to details that turn out to be important in a given instance, and without inflating marginal ones." *United States v. Banks*, 540 U.S. 31, 36 (2003)

3

With reasonableness as the guide, I now briefly turn to the undisputed facts of this case. The two officers, Oakes and Brisbin, were dispatched to a parking lot at 2 a.m. On the way, they learned (from dispatch) that an armed security guard was holding two men at gun point and the guard reported the men <u>may</u> be armed. **[Vol. 3 at 30]** When the officers arrived, they saw the guard "behind [McHugh's] car with his lights on it and pointing his gun at the car and two subjects in the car." (R. Vol. 3 at 31.) The guard told the officers he had sprayed the men with pepper spray and described their behavior as "hinky."[2] (Vol. 3 at 31.) Oakes went to [McHugh's] door and instructed him to get out of the car. "As [McHugh] stepped out of the car he advised [Oakes] that he had a gun." (*Id.* at 32.) As a result, Oakes "brought him back to the back of the car, placed him on his knees, handcuffed him and then started patting him down." (*Id.*)

The steps taken by these officers to diffuse a potentially deadly situation were reasonable, even assuming their actions amounted to a seizure.[3] When they reached the car, the security guard put away his weapon -- an action that reduced, but did not eliminate, the potential for violence. The officers reasonably believed McHugh may have

[2] The professional competence of the security guard is surely debatable, but not particularly relevant. We focus solely on the actions of the officers, but with due regard to the totality of the circumstances. The security guard's acts and statements possibly add context, but little more. In the same vein, whether or not the police had reason to believe the defendant was armed may be significant, but not determinative. Given the situation they encountered, their acts were reasonable even if they did not suspect the defendant or his companion was armed.

[3] The officers made neither a traffic stop nor a *Terry* stop. Any seizure first occurred when McHugh was asked to exit his vehicle, a precaution sanctioned by *Pennsylvania v. Mimms,* 434 U.S. 106, 110 (1977).

a weapon, but even if they had no such belief, ordering him to exit the car was a matter of common sense and done, according to Oakes, for safety reasons.[4] McHugh had been pepper-sprayed by the guard and was likely out of sorts. More important, a vehicle was involved (even though the stop was not instigated by the officers), presenting all of the dangers courts have repeatedly appreciated in such circumstances.[5] Reasonable suspicion of *criminal* activity was not necessary. *See Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977) (Ordering a driver and passenger out of a vehicle for officer safety following a traffic stop is justified -- "We think it too plain for argument that the State's proffered justification -- the safety of the officer -- is both legitimate and weighty. Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties.") (quotations omitted)). Given the officers' valid presence at the scene, the Supreme Court has stressed "[t]he risk of harm to both the police and the occupants of a stopped vehicle is minimized, . . . if the officers routinely exercise unquestioned command of the situation." *Arizona v. Johnson*, --- U.S. ---, 129 S. Ct. 781, 786 (2009) (quotations omitted) (Passenger removed from the back seat of a vehicle stopped for a traffic violation and frisked. The frisk was based upon suspicion of gang membership, a scanner in his pocket and his admitted criminal past).

---

[4] The second officer, Brisbin, was closely watching McHugh's passenger.

[5] Since it did not involve the officers, the legitimacy of the stop is not an issue. Nothing suggests the security guard was acting in concert with the officers or even that they had acquiesced in his conduct. Any suggestion that the officer's attempt to bring a tense situation under control might be construed as a "stop" strains credulity.

5

Removing McHugh from the car was an appropriate response, not just for officer safety but for that of all the participants, one reasonably calculated to quickly de-escalate and control a dangerous situation. McHugh's volunteered statement that he had a gun, fully justified his immediate physical seizure, handcuffing and searching. It "permitted the officer to conclude that [he] was armed and thus posed a serious and present danger to the safety of the officer. "In these circumstances, any man of 'reasonable caution' would likely have conducted the 'pat down.'" *Mimms*, 434 U.S. at 112.

The circumstances of this case render any inquiry into the officers' reasonable suspicion of criminal activity by the defendant or his partner an irrelevant distraction. The question is whether "the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the action taken was appropriate." *Id.* (quotations omitted). To my lights, they did; the officers conducted themselves reasonably throughout the incident. The Fourth Amendment requires nothing more.