FILED
United States Court of Appeals
Tenth Circuit

November 15, 2012

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

BRIAN LUIS GUARDADO,

     Defendant - Appellant.

No. 11-4169

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. No. 10-CR-01042-TC-1)**

Stephen McCaughey, Salt Lake City, Utah, for Defendant - Appellant.

Diana Hagen, Assistant United States Attorney, (and David B. Barlow, United States Attorney, on the brief), Salt Lake City, Utah, for Plaintiff - Appellee.

Before **KELLY**, **TYMKOVICH,** and **GORSUCH**, Circuit Judges.

**KELLY**, Circuit Judge.

     Defendant-Appellant Brian Luis Guardado entered a conditional plea of guilty to one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). He was sentenced to 46 months' imprisonment and 36

months' supervised release. Mr. Guardado reserved his right to appeal the district court's denial of his motion to suppress evidence found during a Terry stop-and-frisk. Exercising that right, Mr. Guardado argues on appeal that the district court erred in holding the officers' stop was based upon reasonable suspicion. Our jurisdiction arises under 28 U.S.C. § 1291, and we affirm.

Background

On September 5, 2010, Detective Jacob Burton, a member of the Metro Gang Task Force, was patrolling an area of South Salt Lake City, Utah. 2 R. 8–9. According to Detective Burton, the task force was targeting the area because of an ongoing "tagging" feud (i.e., graffiti feud) between gangs. Id. at 16–17. In addition, there had been aggravated assaults, a weapons offense, and other crimes in the area. 1 R. 37.[1]

Around 1:00 a.m., Detective Burton noticed four males walking nearby a well-lit intersection. 2 R. 10. The men were about fifteen feet away from Detective Burton's police car. 1 R. 26. They initially drew Detective Burton's attention because they were walking in an area where foot traffic was very sparse at night. 2 R. 10–11. Upon seeing the men, Detective Burton turned his car

---

[1] Both Mr. Guardado and the government agreed to submit the transcript from a state court preliminary hearing in Utah v. Guardado, Case No. 101906861 (Nov. 9, 2010), as evidence for the district court to consider in deciding whether to grant Mr. Guardado's motion to suppress. This transcript is included in the record on appeal.

around.  Id. at 11.  He directed his headlights at the men to "get a better look at who they were and what they were doing."  Id.  Detective Burton observed four Hispanic males.  Id.  One male appeared to be wearing a pair of baggy brown shorts and a brown bandana, another had on a backpack, and a third male wore a brown jacket.  Id. at 11–12.  Detective Burton testified that brown clothing is specific to the QVO or East Side Rascals street gang, and he reported that the "majority" of his graffiti-related arrests involve suspects who carry their graffiti kits in backpacks.  Id. at 17.

Detective Burton drove by the men once more.  Id. at 12.  Based on their clothing, the time of night, and the high-crime area, Detective Burton decided to speak with the men.  Id. at 17.  He pulled up approximately twenty to thirty feet behind them.  Id. at 12.  At the same time, another member of the Metro Gang Task Force, Detective Clark, radioed Detective Burton to ask whether he had seen the group of men.  Id. at 13.  Detective Burton explained that he was getting ready to stop them.  Id.

As he exited the police car, Detective Burton heard someone yell, "Cops." Id.  The man in the brown jacket, Mr. Guardado, began walking away briskly and then "took off running" toward "an extremely high crime area."  Id. at 13, 16.  In response, Detective Burton said, "Police.  Stop.  Police Stop."  Id. at 13.  But Mr. Guardado continued to run.  Id.

Detective Burton ran after Mr. Guardado, yelling at him to stop.  Id. at 14.

- 3 -

During the chase, he saw that Mr. Guardado's hand was in front of his body, which Detective Burton noted was "uncommon in a full pursuit as you're running." Id. Detective Burton believed Mr. Guardado was possibly trying to conceal some type of evidence or weapon, or retrieve a weapon. Id.

Detective Clark pulled his car in front of Mr. Guardado, exited the car, and yelled, "Police. Stop." Id. Mr. Guardado continued to run until Detective Clark tackled him. Id. Detective Burton then placed Mr. Guardado's right arm in a knee lock. Id. at 15. The detectives yelled at Mr. Guardado several times, demanding that he give them his left hand. Id. But Mr. Guardado ignored their orders and kept his hand underneath his body. Id.

Although Mr. Guardado refused to comply with the detectives' demands, Detective Clark eventually was able to pry Mr. Guardado's left hand free. Id. Mr. Guardado was then handcuffed, and Detective Burton frisked his waistband for weapons. Id. He immediately felt a large firearm in the groin area of Mr. Guardado's pants. Id.

The district court determined that the stop and the frisk were constitutional. United States v. Guardado, No. 2:10-CR-1042-TC, 2011 WL 1086065, at *4 (D. Utah Mar. 22, 2011). Initially, Mr. Guardado appealed both of the district court's legal conclusions. See Aplt. Br. 7. At oral argument, however, Mr. Guardado's counsel conceded that, should we hold the seizure constitutional, the ensuing search is appropriately deemed constitutional as well. Therefore, Mr. Guardado's

only remaining claim, which we resolve here, is that police did not possess the reasonable suspicion necessary to justify his initial stop.

## Discussion

In reviewing the denial of a motion to suppress, we accept the district court's factual findings unless clearly erroneous and we view the evidence in the light most favorable to those findings. United States v. Clarkson, 551 F.3d 1196, 1200–01 (10th Cir. 2009). In contrast, we review de novo the district court's determination of reasonableness under the Fourth Amendment. United States v. Polly, 630 F.3d 991, 996 (10th Cir. 2011).

The Fourth Amendment prohibits the government from conducting unreasonable searches and seizures. United States v. Arvizu, 534 U.S. 266, 273 (2002). In the absence of probable cause, the constitutionality of a search or seizure hinges on the objective reasonableness of an officer's suspicion. See Arizona v. Johnson, 555 U.S. 323, 330 (2009). The ultimate inquiry is whether the totality of the circumstances would "warrant a man of reasonable caution in the belief that the action taken was appropriate." Terry v. Ohio, 392 U.S. 1, 22 (1968) (internal quotation marks omitted); see also United States v. Simpson, 609 F.3d 1140, 1146–47 (10th Cir. 2010) (explaining that this evaluation is made from the perspective of a reasonable officer rather than a reasonable person).

Police may constitutionally "conduct a brief, investigatory stop when [an]

officer has a reasonable, articulable suspicion that criminal activity is afoot." Illinois v. Wardlow, 528 U.S. 119, 123 (2000) (citing Terry, 392 U.S. at 30). In determining the reasonableness of an officer's suspicion, we have considered a number of factors including: the area's disposition toward criminal activity, see, e.g., Wardlow, 528 U.S. at 124; United States v. McHugh, 639 F.3d 1250, 1257 (10th Cir. 2011); the time of night, see, e.g., Clarkson, 551 F.3d at 1202; whether the suspect is wearing colors affiliated with known gangs, see, e.g., United States v. Garcia, 459 F.3d 1059, 1067 (10th Cir. 2006); and the suspect's behavior—particularly any flight from law enforcement, see Wardlow, 528 U.S. at 124; see also McHugh, 639 F.3d at 1258. The district court concluded that the totality of the circumstances supported an objectively reasonable suspicion of criminal activity. We agree.

For Fourth Amendment purposes, Mr. Guardado was "seized" when Detective Clark tackled him. See Brendlin v. California, 551 U.S. 249, 254 (2007) (holding that a person is seized only "when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement" (internal quotation marks omitted)). Accordingly, we analyze the facts as they existed at that time—not a moment before. See California v. Hodari D., 499 U.S. 621, 626 (1991).

The district court found that the seizure occurred in a high-crime area. See Guardado, 2011 WL 1086065, at *3. Mr. Guardado acknowledges that a stop's

location is a relevant consideration.  See Aplt. Br. 16.  Nevertheless, he argues that the term "high-crime area" is dangerously vague because "there is not an objective method for determining if the officer's assertion is true."  Id.  Whatever merit there is to Mr. Guardado's argument, the Supreme Court—and accordingly, this circuit—continues to consider an area's disposition toward criminal activity as a factor that contributes to an officer's reasonable suspicion.  See Wardlow, 528 U.S. at 124; accord McHugh, 639 F.3d at 1257; United States v. DeJear, 552 F.3d 1196, 1201 (10th Cir. 2009).  Therefore, while presence in a high-crime area, alone, does not establish reasonable suspicion, the district court correctly factored the area's high crime-rate into its analysis.

Second, the late hour at which the police stopped Mr. Guardado lends weight to the reasonableness of the officers' suspicion.  See Clarkson, 551 F.3d at 1202 ("[T]he time of night [is] a factor in determining the existence of reasonable suspicion.").  The district court found that police seized Mr. Guardado around 1:00 a.m.  In Gallegos v. City of Colorado Springs, we considered the time of night, also around 1:00 a.m., in holding that the police had reasonable suspicion of criminal activity.  See 114 F.3d 1024, 1029 (10th Cir. 1997).  Accordingly, we conclude that a 1:00 a.m., stop is "undoubtedly late enough (or early enough) to be a factor in the reasonable suspicion assessment."  McHugh, 639 F.3d at 1257.

Third, several of the men, including Mr. Guardado, were wearing clothing associated with the QVO gang.  We have held that although gang affiliation is

"not necessarily determinative by itself, . . . gang connection further supports the reasonableness of [an officer's suspicion]." Garcia, 459 F.3d at 1067; see also DeJear, 552 F.3d at 1201; United States v. Santio, 351 F. App'x 324, 329 (10th Cir. 2009) (concluding that the defendant's attire, which the officers believed was a possible indication of gang affiliation, was an appropriate factor for the district court to consider). Here, several of the men, including Mr. Guardado, were wearing brown clothing—the QVO gang's color. Additionally, one of the men wore a backpack, which tagging gangs typically use to carry graffiti kits.

It is true that the officers did not know whether Mr. Guardado was a gang member or if he was engaged in tagging, but Terry demands suspicion not certainty. Reasonable suspicion requires only a "minimal level of objective justification" to support the belief that criminal activity is afoot. United States v. Sokolow, 490 U.S. 1, 7 (1989) (internal quotation marks omitted); see also United States v. Pack, 612 F.3d 341, 356 (5th Cir. 2010) (concluding that police need not have a particularized suspicion of a "specific crime," and noting that the Supreme Court "has often spoken of the wrongdoing itself in general terms"). Further, police "need not rule out the possibility of innocent conduct." Arvizu, 534 U.S. at 277. Reasonable suspicion may exist even where it might be "more likely than not that the individual is *not* involved in any illegality." United States v. Johnson, 364 F.3d 1185, 1194 (10th Cir. 2004).

Finally—and most significantly—Mr. Guardado's flight from police

compounded their reasonable suspicion that he was engaged in some type of criminal activity. Mr. Guardado argues that Detective Burton was intent on conducting a stop-and-frisk from the moment he first spotted the group of men. Aplt. Br. 14–15. Indeed, Detective Burton testified that he "would have probably done a Terry frisk on [the men]" even if Mr. Guardado had not fled. 1. R. 33. But "[w]e have long since rejected the notion that an officer's subjective motivations in effecting a stop are relevant to the <u>Terry</u> analysis." <u>United States v. Winder</u>, 557 F.3d 1129, 1134 (10th Cir. 2009). In other words, the "actual motivations or subjective beliefs and intentions of the [particular] officer are irrelevant." <u>United States v. DeGasso</u>, 369 F.3d 1139, 1143 (10th Cir. 2004). Instead, we evaluate the reasonableness of an officer's actions by using an objective standard and focusing on the circumstances as they existed at the time of the seizure. Here, Mr. Guardado was seized *after* he fled from police; we therefore evaluate the stop's reasonableness in light of his preceding flight.

Evasive behavior is a factor in our Fourth Amendment analysis because while not determinative of wrongdoing, it certainly can suggest it. <u>See</u> <u>Wardlow</u>, 528 U.S. at 124. The Supreme Court goes further: "[h]eadlong flight—wherever it occurs—is the consummate act of evasion." <u>Id.</u>

Mr. Guardado argues that flight, alone, "rarely if ever can provide an officer with reasonable suspicion." Aplt. Br. 12. Mr. Guardado relies heavily on our decision in <u>United States v. Davis</u>, 94 F.3d 1465 (10th Cir. 1996). <u>See</u> Aplt.

Br. 9–13.  There, we held that police lacked reasonable suspicion despite the fact that the stop occurred in a high-crime area and the officer knew the defendant was in a gang.  See Davis, 94 F.3d at 1467–68.  But unlike Mr. Guardado, who hastily fled from officers, the Davis defendant simply walked away from police.  Id. at 1468.  The government therefore argues that the facts in Mr. Guardado's case are more akin to Wardlow than Davis.  Aplee. Br. 18–19; see Guardado, 2011 WL 1086065, at *3 ("[T]he facts here . . . are far more indicative of criminal behavior than those in Davis.").  We agree.

Mr. Guardado took off in a "headlong flight" from the officers.  Like the Wardlow defendant, Mr. Guardado engaged in "the consummate act of evasion." Wardlow, 528 U.S. at 124.  In fact, he did so in the context of circumstances already lending themselves to a reasonable suspicion of criminal activity—Mr. Guardado was spotted in a high-crime area, late at night, wearing the color of a local gang.  Moreover, he fled in a manner highly suggestive of criminality, grabbing his waistband in what appeared to be an effort "to conceal some type of evidence . . . or retrieve a weapon."  2 R. 14.

"[T]he level of suspicion required [for an investigatory stop] is 'considerably less' than proof by a preponderance of the evidence or that required for probable cause."  United States v. Lopez, 518 F.3d 790, 799 (10th Cir. 2008) (quoting Sokolow, 490 U.S. at 7).  Thus, we reject the argument that the officers were required to have evidence linking Mr. Guardado to a particular gang or

particular criminal activity. Direct evidence of a specific, particular crime is unnecessary. See Pack, 612 F.3d at 355. The Fourth Amendment merely requires commonsense judgments and reasonable inferences. Wardlow, 528 U.S. at 124–25. Even conduct that is lawful, when observed through the prism of experience and considered in light of the circumstances, may warrant further investigation. See Arvizu, 534 U.S. at 273–74.

In this case, several factors—the most important of which was Mr. Guardado's own evasive behavior— converged to create an objectively reasonable suspicion that criminal activity was afoot. Therefore, we hold that the seizure did not violate the Fourth Amendment.

AFFIRMED.