FILED
United States Court of Appeals
Tenth Circuit

August 14, 2015

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

DANIEL ENRIQUE PADILLA-
ESPARZA,

      Defendant - Appellant.

No. 14-2191

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. No. 2:13-CR-03676-KG-1)**

---

Kari Converse, Assistant Federal Public Defender (Stephen P. McCue, Federal Public Defender, with her on the briefs), Office of the Federal Public Defender, Albuquerque, New Mexico, appearing for Defendant-Appellant.

Anna R. Wright, Special Assistant United States Attorney (Damon P. Martinez, United States Attorney, with her on the brief), Office of the United States Attorney, Las Cruces, New Mexico, appearing for Plaintiff-Appellee.

---

Before **LUCERO**, **TYMKOVICH**, and **MATHESON**, Circuit Judges.

---

**MATHESON**, Circuit Judge.

---

United States Customs and Border Protection ("CBP") Officer Manuel Aguilera issued a "Be on the Lookout" ("BOLO") alert for Daniel Padilla-Esparza and his truck for suspected bulk cash or drug smuggling. Based on the BOLO, United States Border Patrol agents ("BPAs") stopped Mr. Padilla-Esparza after he crossed the Las Cruces, New Mexico border patrol checkpoint. The BPAs released him because they believed they had stopped the wrong truck. When they discovered a few minutes later they had actually stopped the right truck, they initiated a second stop. After a drug-detection dog alerted to the presence of narcotics, they discovered 16 kilograms of cocaine in a non-factory compartment.

Based on the evidence seized, a federal grand jury charged Mr. Padilla-Esparza with one count of possession with intent to distribute 5 kilograms or more of cocaine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A). He filed a motion to suppress, contending the BPAs seized evidence in violation of the Fourth Amendment. The district court denied his motion. He then entered a conditional guilty plea, reserving the right to appeal the denial of his motion to suppress. Mr. Padilla-Esparza now appeals. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I. BACKGROUND

### A. *Factual Background*

Mr. Padilla-Esparza is a Mexican citizen and United States lawful permanent resident. On February 25, 2013, he was traveling from Mexico to the United States through the Paso del Norte ("PDN") port of entry in El Paso, Texas. CBP officers

stopped Mr. Padilla-Esparza after a drug-detection dog alerted to his truck. Officers

searched his truck and found an empty, hidden non-factory compartment. The officers

released Mr. Padilla-Esparza, but they entered an alert on the Treasury Enforcement

Communications System ("TECS")[1] regarding Mr. Padilla-Esparza and his truck—a

silver Honda Ridgeline with temporary license plates.

Nearly seven months later, on September 7, 2013, CBP officers conducting

outbound inspections stopped Mr. Padilla-Esparza at PDN while he was traveling

southbound to Mexico. Mr. Padilla-Esparza had two pieces of luggage and declared that

he had $300 in cash. Shortly thereafter, he reported having an additional $2,000 in cash

hidden in a camera case. The officers referred Mr. Padilla-Esparza for further inspection

and ran his information through the TECS, where they came across the February 25, 2013

TECS alert.

The officers informed CBP Officer Aguilera. He ran a query for the prior six

months and learned that Mr. Padilla-Esparza had traveled through the Las Cruces and

Alamogordo, New Mexico border patrol checkpoints at least once per month.

Officer Aguilera and his partner interviewed Mr. Padilla-Esparza. Mr. Padilla-

Esparza told them he was traveling from his home in Denver, Colorado to meet his

girlfriend at the airport. He told them he owned a landscaping business and worked for

clients in Albuquerque, Santa Fe, and Colorado. He had no paperwork for his last three

---

[1] TECS is a database used by CBP to input information related to a particular person and create alerts.

jobs, could not remember the names or addresses of his last three clients, and could not remember how much he was paid for each job. The officers also searched Mr. Padilla-Esparza's belongings and found receipts totaling $1,300 for new clothing from outlet malls. Based on his knowledge and experience, Officer Aguilera found Mr. Padilla-Esparza's spending habits and his limited explanation of his landscaping business to be inconsistent.

Later that day, Officer Aguilera created a second TECS alert for Mr. Padilla-Esparza, noting possible bulk cash or drug smuggling, and updated TECS with Mr. Padilla-Esparza's permanent license plate number. Officer Aguilera also set up an alert to be sent to his cell phone when Mr. Padilla-Esparza returned to the United States.

On September 10, 2013, Officer Aguilera received an alert that Mr. Padilla-Esparza had re-entered the United States. Officer Aguilera contacted the CBP Operations Center and activated a BOLO for Mr. Padilla-Esparza and his truck. The Operations Center disseminated the BOLO to the United States Border Patrol and other law enforcement agencies. The BOLO stated,

> Daniel Enrique Padilla Esparza . . . may attempt to smuggle narcotics or currency thru the Las Cruces or Alamogordo Border Patrol Checkpoints. Subject may be driving a Gray Honda Ridgeline bearing Colorado plates 236YWY. Vehicle has a non factory compartment on top of the gas tank. Subject last made entry into the United States on 9/10/13 at 2109 hours (MDT) thru the Paso Del Norte Port of Entry. Lookouts have been generated on subject and vehicle. If encountered, detain and conduct intensive exam.

Supp. ROA at 38.

Three days later, on September 13, 2013, at around 6:00 a.m., BPAs at the Las Cruces Border Control checkpoint on Interstate 25 reviewed Mr. Padilla-Esparza's BOLO during their morning meeting. Later that day, around noon, Mr. Padilla-Esparza entered the Las Cruces Border Patrol checkpoint in his truck. It was raining hard and traffic was heavy. For safety reasons, BPA Cindy Morales, who was conducting northbound inspections, exercised her discretion to temporarily forgo inspections and waved vehicles through, including Mr. Padilla-Esparza's.

At the same time, BPA Ivan Cervantes was monitoring the License Plate Reader ("LPR").[2] When Mr. Padilla-Esparza's truck entered the ramp leading up to the checkpoint, the LPR alerted that Mr. Padilla-Esparza's vehicle had a BOLO on it. BPA Cervantes informed BPA Morales.[3] BPA Morales stopped traffic, and both agents began searching for Mr. Padilla-Esparza's truck. BPA Cervantes spotted the truck leaving the checkpoint and realized that BPA Morales had already waved it through.

BPA Cervantes informed BPAs Erik Cansino and Gary Adams that he believed the subject of the BOLO reviewed at the morning meeting had just been waved through the checkpoint. He then got into his service truck with his drug-detection dog and

---

[2] The LPR takes photos of inbound vehicles' license plates and runs checks on the vehicle, including any alerts. It then relays the information to BPAs.

[3] BPA Cervantes only briefly glanced at the LPR's screen before contacting BPA Morales. As a result, he only noted the vehicle's color and make. He did not remember the BOLO subject's name or license plate number.

proceeded after Mr. Padilla-Esparza. BPAs Cansino and Adams also pursued Mr. Padilla-Esparza in a separate car.

BPAs Cansino and Adams caught up with Mr. Padilla-Esparza first. At 12:04 p.m., they stopped his truck on I-25, approximately 15 miles from the checkpoint. BPA Adams reported to dispatch that they had pulled over a truck bearing Colorado license plate 236YWY. BPA Cansino then approached the driver's side window. As he approached, Mr. Padilla-Esparza rolled down his window and handed BPA Cansino his driver's license and permanent resident alien card. BPA Cansino quickly looked into Mr. Padilla-Esparza's truck to make sure he was the only occupant. He then returned to his vehicle.

As BPA Cansino was returning to his vehicle, BPA Cervantes arrived at the scene. BPA Cervantes erroneously informed BPA Cansino that the subject of the BOLO had New Mexico license plates, and that they had stopped the wrong vehicle. BPA Cansino immediately returned Mr. Padilla-Esparza's documents and released him.

As Mr. Padilla-Esparza was driving away, BPA Adams again contacted dispatch. Dispatch informed the agents that Mr. Padilla-Esparza's truck was in fact the subject of the BOLO. Upon learning this information, the agents began pursuing Mr. Padilla-Esparza again.

At 12:07 p.m., BPAs Cansino and Adams initiated a second traffic stop of Mr. Padilla-Esparza two miles down the road. BPA Cansino asked Mr. Padilla-Esparza for consent to perform a canine search of his truck. He consented.

BPA Cervantes arrived with his drug-detection dog and confirmed with Mr. Padilla-Esparza his consent to the search. The dog, which was certified to detect the odor of narcotics, began alerting midway along the tailgate and tried to get underneath the truck.

The BPAs informed Mr. Padilla-Esparza that the dog had alerted to his truck. Due to the rain, BPA Cansino asked Mr. Padilla-Esparza if he would follow the agents back to the checkpoint. Mr. Padilla-Esparza agreed. At the checkpoint, BPA Cervantes searched Mr. Padilla-Esparza's truck and found 16 kilograms of cocaine in the non-factory compartment.

## B. *Procedural Background*

On November 13, 2013, a federal grand jury indicted Mr. Padilla-Esparza for one count of possession with intent to distribute 5 kilograms or more of cocaine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A). On March 21, 2014, Mr. Padilla-Esparza moved to suppress the evidence seized from his truck. After conducting an evidentiary hearing, the district court denied the motion.

Mr. Padilla-Esparza pled guilty under a conditional plea agreement that allowed him to appeal the district court's denial of his motion to suppress. The court sentenced him to 78 months in prison followed by two years of supervised release. Mr. Padilla timely appealed.

## II.  DISCUSSION

Mr. Padilla-Esparza challenges the district court's denial of his motion to suppress on two grounds.[4]  He argues (1) the first stop on September 13, 2013, was unlawful because Officer Aguilera lacked reasonable suspicion to issue the September 10, 2013 BOLO, which was the basis for the stop, and (2) the BPAs lacked reasonable suspicion for their second stop.  We conclude reasonable suspicion supported both the BOLO and the second stop.  Accordingly, we affirm.

### A. *Standard of Review and Legal Background*

### 1.  **Standard of Review**

In reviewing "a district court's denial of a motion to suppress, we review de novo the district court's ultimate determination of reasonableness under the Fourth Amendment." *United States v. Ruiz*, 664 F.3d 833, 838 (10th Cir. 2012).  "[W]e accept the district court's factual findings unless they are clearly erroneous and we view the evidence in the light most favorable to the prevailing party." *Id.*

### 2.  **Legal Background**

The Fourth Amendment protects individuals from "unreasonable searches and seizures."  U.S. Const. amend. IV.  A traffic stop is a seizure under the Fourth Amendment. *United States v. Rodriguez-Rodriguez*, 550 F.3d 1223, 1226 (10th Cir. 2008).  A traffic stop is valid if it (1) is "justified at its inception" by "specific and

---

[4] Before the district court, Mr. Padilla-Esparza also argued the evidence should be suppressed on five additional grounds.  On appeal, he does not contest the district court's denial of his motion on these grounds.

articulable facts" that "give rise to a reasonable suspicion a person has or is committing a crime," *United States v. Whitley*, 680 F.3d 1227, 1232 (10th Cir. 2012), and (2) is "reasonably related in scope to the circumstances which justified the interference in the first place," *United States v. Tibbetts*, 396 F.3d 1132, 1136 (10th Cir. 2005).

Although reasonable suspicion is a less rigorous standard than probable cause, it requires "more than an inchoate and unparticularized suspicion or hunch." *United States v. McHugh*, 639 F.3d 1250, 1255 (10th Cir. 2011) (quotations omitted). In determining whether reasonable suspicion exists, we consider the totality of the circumstances "rather than assessing each factor or piece of evidence in isolation." *Id.* at 1256. "Under this objective standard, we ask whether the facts available to the detaining officer, at the time, warranted an officer of reasonable caution in believing the action taken was appropriate." *Id.* (quotations omitted). Officers "need not rule out the possibility of innocent conduct," *United States v. Arvizu*, 534 U.S. 266, 277 (2002), and may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person," *id.* at 273 (quotations omitted).

"When law enforcement officials rely on a bulletin or alert to conduct a stop or make an arrest, the relevant inquiry is whether the officer who issued the alert—rather than the officer who conducted the challenged action—had the requisite level of suspicion." *Rodriguez-Rodriguez*, 550 F.3d at 1227; *accord United States v. Hensley*, 469 U.S. 221, 233 (1985). Therefore, we must ask (1) whether Officer Aguilera had

reasonable suspicion that Mr. Padilla-Esparza was engaging in criminal activity to issue the BOLO, and (2) whether reasonable suspicion still existed when the BPAs initiated the second stop.

B. *Analysis*

1. **Officer Aguilera Had Reasonable Suspicion to Issue the BOLO**

Mr. Padilla-Esparza argues the first stop violated the Fourth Amendment because Officer Aguilera did not have reasonable suspicion to issue the BOLO. We disagree.

The following facts, known to Officer Aguilera, formed a reasonable basis to issue the BOLO. First, he knew a drug-detection dog had alerted to a hidden, non-factory compartment in Mr. Padilla-Esparza's truck on February 25, 2013. Based on his experience as a 16-year veteran of the CBP, Officer Aguilera knew such compartments often are used to hide contraband, and that the dog alert suggested the compartment may have been used to store currency or narcotics.

Second, Officer Aguilera knew that on September 7, 2013, Mr. Padilla-Esparza initially failed to declare $2,000 dollars he had hidden in his camera case and that currency or drug smugglers often do not declare the full amount of cash they carry across the border.

Third, Officer Aguilera knew that on September 7, 2013, Mr. Padilla-Esparza had receipts for $1,300 in clothing purchases from outlet malls. He detected inconsistencies between these purchases and Mr. Padilla-Esparza's inability to offer any details about

-10-

how he made money, including the identity of his most recent landscaping clients or how much he was paid for each job.

Finally, Officer Aguilera knew Mr. Padilla-Esparza had frequently traveled through the Las Cruces and Alamogordo checkpoints in the past six months, which was consistent with bulk cash or drug smuggling.[5]

Considering the totality of the circumstances, *see United States v. Sokolow*, 490 U.S. 1, 8-10 (1989), we conclude Officer Aguilera had reasonable suspicion Mr. Padilla was involved in criminal activity.

Mr. Padilla-Esparza raises two arguments. First, he argues that the facts relied on by the district court are subject to innocent explanations. In particular, he argues the mere existence of a hidden compartment, his statements regarding his landscaping business, and his travel through checkpoints are all subject to innocent explanation. Perhaps they are, but the possibility of innocent explanations does not foreclose reasonable suspicion, *Arvizu*, 534 U.S. at 277, and does not undermine it here.

Second, Mr. Padilla-Esparza argues he had traveled through the New Mexico checkpoints the prior six months without BPAs finding anything suspicious. Nothing in

---

[5] The Government also relies on Officer Aguilera's testimony that Mr. Padilla-Esparza stated "I never go to Mexico," in response to Officer Aguilera's asking why he did not take his vehicle into Mexico. ROA, Vol. III at 23. Mr. Padilla-Esparza argues that his response most likely reflects a language barrier given that he was in line to enter Mexico at the time. We do not rely on this statement to affirm on the issue of reasonable suspicion.

the record, however, indicates the BPAs searched Mr. Padilla-Esparza's truck during that time.

Accordingly, because Officer Aguilera had reasonable suspicion to issue the BOLO, the first stop was valid and the district court did not err.

## 2. **The BPAs Had Reasonable Suspicion for the Second Stop**

Mr. Padilla-Esparza argues the BPAs lacked reasonable suspicion for the second stop. He contends that (1) any reasonable suspicion based on the BOLO dissipated after the first stop and (2) the agents did not acquire any new information between the two stops to establish reasonable suspicion. We conclude the BPAs' reasonable suspicion was not dissipated after the first stop. The second stop was therefore reasonable.

Successive investigatory stops are not per se prohibited, though a second stop is "inherently more intrusive and coercive than the first." *United States v. Ilazi*, 730 F.2d 1120, 1126 (8th Cir. 1984). Rather, a second stop violates the Fourth Amendment when the prior stop had dissipated the reasonable suspicion offered to justify the second stop. *See United States v. Peters*, 10 F.3d 1517, 1522 (10th Cir. 1993). A law enforcement official may perform a second investigatory stop as long as nothing in the first encounter "serves to dispel his [or her] fears and suspicions" that "criminal conduct may be afoot." *Id.* (quotations omitted).

Mr. Padilla-Esparza's reliance on *Peters* is misplaced. In *Peters*, two defendants were convicted of unlawful possession of identification documents and false representation of citizenship based on evidence discovered during a second investigatory

-12-

stop. *Id.* at 1518, 1520. A police officer first stopped the defendants in Flagstaff,

Arizona for weaving. *Id.* at 1519. The officer obtained driver's licenses from both, who

said they were moving from California to Dallas. *Id.* The officer asked where they were

originally from, and the men responded they were Nigerian. *Id.* The officer observed

they were "extremely nervous." *Id.* A computer check of their licenses, however,

revealed no irregularities. *Id.* The officer decided to investigate whether the defendants

were nervous because they were transporting illegal drugs. *Id.* He requested a drug-

detection dog, but none was available. *Id.* The driver consented to a manual search of

the truck, which revealed no evidence of drugs or other illegal activity. *Id.* The officer

issued the driver a warning for weaving and let the defendants go. *Id.*

After the encounter, however, the officer was not satisfied with the search because

of the defendants' nervousness and his failure to obtain a drug-detection dog. *Id.* The

matter was referred to an agent at the border patrol station in Albuquerque, New Mexico.

*Id.* at 1520. The agent intercepted the defendants' truck and pulled them over based on

what he perceived to be "nervous behavior." *Id.* He also requested back-up and a drug-

detection dog, which both promptly arrived. *Id.* The agent obtained permission to search

one of the defendants' wallets and found a counterfeit social security card. *Id.* The agent

and back-up officers also obtained permission to search the truck, where they found

additional false identification documents. *Id.*

The defendants moved to suppress the evidence, arguing the agent lacked

reasonable suspicion for the second stop. *Id.* at 1518-19. The district court denied the

motion. *Id.* at 1518. We reversed, concluding that the second stop was not valid because the DEA agent lacked "an objective and particularized basis for his suspicions that was reasonable and sufficient to justify the second intrusion." *Id.* at 1521. We explained that "[t]he results of the initial stop in Flagstaff, without any new information, dispelled any reasonable suspicion of illegal activity as a matter of law." *Id.*

Unlike in *Peters*, the BPAs' initial stop of Mr. Padilla-Esparza did not dispel reasonable suspicion. After obtaining Mr. Padilla-Esparza's identification, the agents quickly aborted the stop based upon BPA Cervantes's erroneous belief that they had pulled over the wrong truck. The BPAs did not question Mr. Padilla-Esparza or search his vehicle. When dispatch confirmed that they had released the correct suspect, reasonable suspicion based on the BOLO remained and the agents were justified in initiating a second stop.[6] The second stop did not violate the Fourth Amendment.[7]

### III. CONCLUSION

Based on the foregoing, we affirm.

---

[6] Because we conclude that reasonable suspicion was not dissipated after the first stop, we do not reach the Government's alternative arguments that (1) new information supported the second stop and (2) the good-faith exception should apply.

[7] Mr. Padilla-Esparza also argues that the canine search of his vehicle was unconstitutional. In his opening brief, however, he argues only that the canine search was illegal because the agents did not have reasonable suspicion to stop him. Because we conclude reasonable suspicion supported the second stop, this argument also fails. To the extent Mr. Padilla-Esparza attempts to cast this as a separate ground for reversing the district court in his reply brief, we decline to consider it because it was not raised in his opening brief. *See Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007).