FILED
United States Court of Appeals
Tenth Circuit

December 31, 2013

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

# UNITED STATES COURT OF APPEALS

## TENN CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

DANIEL MANUEL RODRIGUEZ,

Defendant - Appellant.

No. 12-2203

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. No. 1:11-CR-02158-JB-1)
(836 F. Supp. 2d 1258)**

Scott M. Davidson, The Appellate Law Office of Scott M. Davidson, Albuquerque, New Mexico, for Defendant-Appellant.

James R. W. Braun, Assistant United States Attorney (Kenneth J. Gonzales, United States Attorney, with him on the brief), Albuquerque, New Mexico, for Plaintiff-Appellee.

Before **GORSUCH** and **BALDOCK**, Circuit Judges, and **JACKSON**, District Judge.[*]

**BALDOCK**, Circuit Judge.

---

[*] Honorable R. Brooke Jackson, United States District Judge for the District of Colorado, sitting by designation.

Section 30-7-1 of the New Mexico Criminal Code defines "[c]arrying a deadly weapon" as "being armed with a deadly weapon by having it on the person, or in close proximity thereto, so that the weapon is readily accessible for use." Section 30-7-2 of the Code is entitled "Unlawful carrying of a deadly weapon." Subject to five enumerated exceptions, subsection (A) proscribes "carrying a concealed loaded firearm or any other type of deadly weapon anywhere[.]" N.M. Stat. Ann. § 30-7-2(A). The issue presented in this appeal is whether a police officer who observes a handgun tucked in the waistband underneath the shirt of a convenience store employee has reasonable suspicion that the employee is unlawfully carrying a deadly weapon in violation of § 30-7-2(A), in turn justifying a "stop and frisk." The answer is yes.

I.

We succinctly state the relevant facts. Around 6:00 p.m. on July 27, 2011, Albuquerque Police Officer Frank Munoz responded to a dispatch informing him that two employees of the "Pit Stop" convenience store and gas station, located at 6102 Central Avenue SW in a reportedly "high crime" area, were showing each other handguns. Tr. vol. 3, at 8, 44. Fellow Officer Steven Miller also responded to the dispatch. Officer Munoz described the store as being "pretty small on the inside." Id. at 13. Upon entering the store, Officer Munoz, accompanied by Officer Miller, observed Defendant Daniel Rodriguez a "couple feet away" stocking shelves. Id. at 14. As Defendant bent over, Officer Munoz noticed a silver handgun tucked in the

2

back waistband of his pants. Defendant's shirt concealed the handgun when he stood upright. Officer Munoz told Defendant, "Let me see your hands, and let's step outside." Id. at 51. At the suppression hearing, Officer Munoz testified:

> [Defendant] asked us what for, "What did I do?" And since we were in a pretty cramped area when we walked in, I didn't want myself and Officer Miller or [Defendant], all of us, to be in that cramped area in case anything occurred, so I told him, "Let's step outside," and that I needed to ask him a question. He was a little upset and wanted to know what he had done. I told him to step outside. He then went past myself and Officer Miller to the door. As he pushed the door open once again his shirt came up, and I saw the gun, and it was at that time I pulled the gun out of the back of his waistband.

Id. at 16. When asked why he removed the gun from Defendant's waistband, Officer Munoz stated, "Just for officer safety, until we could figure out what was going on and why he had a firearm." Id.

Outside the store, Officer Munoz promptly asked Defendant why he was concealing a handgun. Defendant responded that "somebody had shot at him at that same location at the gas station." Id. at 25. Officer Munoz asked Defendant whether he had a permit to carry the handgun. Defendant said he did not. Officer Munoz instructed Defendant to turn around and place his hands in the frisk position on a nearby truck. Visible tattoos on Defendant's legs prompted Officer Munoz, a former prison guard, to ask Defendant if he had been arrested. Defendant stated he recently had been released from prison. Following an unremarkable "pat search" of Defendant, Officer Munoz permitted him to sit on the curb and smoke a cigarette. Id. at 19. Meanwhile, Officer Miller ran a check of the handgun removed from

3

Defendant's waistband—a Smith and Wesson model 66–4, .357 magnum revolver loaded with five rounds of Winchester brand .357 ammunition. The check reported the handgun was stolen. Officer Munoz handcuffed Defendant and placed him under arrest. Further investigation confirmed Defendant was a convicted felon.

A federal grand jury charged Defendant with one count of being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Defendant filed a motion to suppress evidence, claiming a number of constitutional violations arising out of the foregoing incident. The district court denied his motion in a lengthy opinion. United States v. Rodriquez, 836 F. Supp. 2d 1258 (D.N.M. 2011). Defendant subsequently entered a conditional plea of guilty pursuant to Fed. R. Crim. P. 11(a)(2). After the court sentenced him to 30-months imprisonment, Defendant appealed only his Fourth Amendment claims that Officer Munoz unreasonably seized him and removed the handgun from his waistband.[1] According to Defendant, "[p]ossession of a concealed firearm in the State of New Mexico, standing alone, cannot be the basis for the type of investigative detention and weapons seizure that [he] was subjected to." Def's Op. Br. at 15. Notably, Defendant does not dispute the district court's findings, which are consistent with our recitation of the facts. The only question for us is whether the law as applied to those facts supports Defendant's claim that Officer Munoz violated his Fourth

---

[1] We note that Defendant has never challenged Officer Munoz's actions, or the state law applicable thereto, as contrary to the Second Amendment.

4

Amendment rights. We review de novo the district court's determination that the officer's actions were reasonable within the meaning of the Fourth Amendment. See Ornelas v. United States, 517 U.S. 690, 699 (1996). Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

II.

Prior to Terry v. Ohio, 392 U.S. 1 (1968), the Supreme Court had not decided whether a sort of lawful police encounter exists "which does not depend solely upon the voluntary cooperation of the citizen and yet which stops short of an arrest based upon probable cause."[2] Id. at 11. In Terry, the Supreme Court concluded a police officer's stop and brief detention of an individual and limited search of his person for weapons—commonly referred to as a "stop and frisk"—does not necessarily violate the Fourth Amendment's reasonableness requirement in the absence of probable cause. Id. at 27. That is to say, a police officer "may in appropriate circumstances and in an appropriate manner" detain a person to investigate suspected criminal behavior even though probable cause to arrest is lacking. Id. at 22.

---

[2] When a defendant challenges the constitutional validity of a warrantless arrest, the question is whether probable cause existed for the arrest. Devenpeck v. Alford, 543 U.S. 146, 152 (2004). Probable cause exists where the facts and circumstances known to the officer at the time of arrest, and of which the officer had reasonably trustworthy information, were sufficient to warrant a prudent person in believing defendant had committed or was committing a criminal offense. Beck v. Ohio, 379 U.S. 89, 91 (1964). The Government in this case has never suggested probable cause justified Defendant's initial seizure.

To determine the reasonableness of a warrantless seizure and accompanying search in the absence of probable cause, Terry instructs us to ask "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." Id. at 20. Consistent with Terry, a police officer may briefly detain an individual suspected of criminal activity if the officer has reasonable suspicion based on articulable facts, together with rational inferences to be drawn therefrom, that criminal activity is afoot. See United States v. Harris, 313 F.3d 1228, 1234 (10th Cir. 2002). Additionally, Terry permits the officer to conduct a protective frisk of such individual if the officer reasonably believes he might be armed and dangerous. Id. "The stop and the search are independent actions, and each requires its own justification." United States v. Gatlin, 613 F.3d 374, 378 (3d Cir. 2010) (citing Arizona v. Johnson, 555 U.S. 323, 326–27 (2009)).

"Reasonable suspicion is a particularized and objective basis for suspecting the person stopped of criminal activity." United States v. Treto-Haro, 287 F.3d 1000, 1004 (10th Cir. 2002) (internal quotation marks omitted). The circumstances necessary to arouse reasonable suspicion fall "considerably short of satisfying a preponderance of the evidence standard." United States v. Arvizu, 534 U.S. 266, 274 (2002). In United States v. Sokolow, 490 U.S. 1 (1989), the Supreme Court explained "probable cause means 'a fair probability that contraband or evidence of a crime will be found,' . . . and the level of suspicion required for a Terry stop is

6

obviously less demanding than that for probable cause." Id. at 7 (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).

The Supreme Court has recognized "there could . . . be circumstances in which wholly lawful conduct might justify the suspicion that criminal activity was afoot." Reid v. Georgia, 448 U.S. 438, 441 (1980) (per curiam). We too have explained that "[r]easonable suspicion may exist even where it might be more likely than not that the individual is *not* involved in any illegality." United States v. Guardado, 699 F.3d 1220, 1224 (10th Cir. 2012) (internal quotation marks omitted). "The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers." United States v. Cortez, 449 U.S. 411, 418 (1981).

## III.

The Government does not contest Defendant's assertion that he was seized from the outset of his encounter with Officers Munoz and Miller. "[A] person is seized for Fourth Amendment purposes when, considering all the surrounding circumstances, the police conduct 'would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.'" United States v. King, 990 F.2d 1552, 1556 (10th Cir. 1993) (quoting Florida v. Bostick, 501 U.S. 429, 439 (1991)). Officer Munoz testified that

7

when he announced his presence by telling Defendant, "Let me see your hands, and let's step outside," Defendant "clearly had no choice" but to do what was asked of him. Tr. vol. 3, at 51, 54. That constitutes a seizure.

To justify seizing Defendant at the inception of the encounter, Officer Munoz, absent probable cause, had to possess reasonable suspicion, that is, some "'minimal level of objective justification' to support the belief that criminal activity [was] afoot." Guardado, 699 F.3d at 1224 (quoting Sokolow, 490 U.S. at 7). Officer Munoz had to be able to articulate, in an objective sense, "something more than an 'inchoate and unparticularized suspicion or hunch'" that Defendant was engaged in criminal activity. Sokolow, 490 U.S. at 7 (quoting Terry, 392 U.S. at 27). So what could a prudent officer cognizant of the facts and circumstances known to Officer Munoz reasonably suspect? We find the answer in a sound construction of § 30-7-2 of the New Mexico Criminal Code, coupled with some "common sense conclusions about human behavior" that an experienced officer reasonably could draw from witnessing Defendant carrying a concealed handgun in an area accessible to the public. Cortez, 449 U.S. at 418.

A.

Section 30-7-2 of the New Mexico Criminal Code provides in relevant part:

A. Unlawful carrying of a deadly weapon consists of carrying a concealed loaded firearm or any other type of deadly weapon anywhere, except in the following cases:

8

(1) in a person's residence or on real property belonging to him as owner, lessee, tenant or licensee;

(2) in a private automobile or other private means of conveyance, for lawful protection of the person's or another's person or property;

\* \* \*

(5) by a person in possession of a valid concealed handgun license issued to him by the department of public safety pursuant to the provisions of the Concealed Handgun Carry Act.

B. Nothing in this section shall be construed to prevent the carrying of any unloaded firearm.

C. Whoever commits unlawful carrying of a deadly weapon is guilty of a petty misdemeanor.

N.M. Stat. Ann. § 30-7-2.[3]

Since the initial version of the statute's passage in 1963 (then codified at N.M. Stat. Ann. § 40A-7-2 (1953)), its prohibition against carrying a concealed loaded firearm has read precisely the same: "Unlawful carrying of a deadly weapon consists of carrying a concealed loaded firearm . . . anywhere[.]" N.M. Stat. Ann. § 30-7-2(A). Subsection (A) as applied to firearms states a clear, definite, and general offense, and then excepts certain acts or classes of individuals from its scope. The first two exceptions, subsections (A)(1) and (2), authorize individuals to carry concealed loaded handguns on *their* property, and in private automobiles for

---

[3] Subsections (A)(3) and (4) except qualified "peace" officers from subsection (A)'s general prohibition.

9

lawful protection. These two subsections have read substantially the same since 1963. Id. § 30-7-2(A)(1) & (2). In 2001, the New Mexico legislature added a third exception also applicable to private individuals. Subsection (A)(5) authorizes a person possessing a valid concealed handgun license from the State's department of public safety to carry a concealed loaded handgun in New Mexico. Id. § 30-7-2(A)(5).

But most assuredly, the Government need not negate these exceptions to N.M. Stat. Ann § 30-7-2(A) to establish the crime of "carrying a concealed loaded firearm . . . anywhere" in New Mexico. Id. § 30-7-2(A). In State v. Madsen, 5 P.3d 573 (N.M. Ct. App. 2000), the New Mexico Court of Appeals held that once a suspect acknowledged he was carrying a concealed loaded handgun, officers had *probable cause* to believe he was "committing the crime of unlawfully carrying a deadly weapon" in violation of N.M. Stat. Ann. § 30-7-2, "and could arrest him." Id. at 578. In United States v. Henning, 906 F.2d 1392 (10th Cir. 1990), we held that "[o]nce the patdown disclosed the presence of a loaded, concealed weapon, there was probable cause to arrest [the suspect] for carrying a concealed weapon in violation of N.M. Stat. Ann. § 30-7-2." Id. at 1396. The manifest proposition for which both Madsen and Henning stand is carrying a concealed loaded handgun on or about one's person in New Mexico is presumptively unlawful.

This presumption based on the language and structure of § 30-7-2(A) is well grounded in established principles of statutory construction. The general

10

rule—which we have no reason to think the New Mexico Supreme Court would decline to recognize—is a defendant must establish "that he is within an exception to a penal statute in order to take advantage of it." State v. Roybal, 667 P.2d 462, 464 (N.M. Ct. App. 1983). Years ago we too recognized that where a general provision defines the elements of an offense, the Government need not "negative exceptions" to that provision to charge a crime and obtain a conviction. Nicoli v. Briggs, 83 F.2d 375, 379 (10th Cir. 1936) (citing McKelvey v. United States, 260 U.S. 353 (1922)). "Nor is it a matter of importance whether the excepting clause is in parenthesis, or set off by commas, at the beginning of the sentence, or follows a proviso at the end." Id.

The Supreme Court has told us a statutory exception to a crime constitutes an element of that crime only where the exception "is so incorporated with the language defining the offence that the ingredients of the offence cannot be accurately and clearly described if the exception is omitted." United States v. Cook, 84 U.S. 168, 173 (1872). Accordingly, "where one can omit the exception from [a] statute without doing violence to the definition of the offense," United States v. McArthur, 108 F.3d 1350, 1353 (11th Cir. 1997), that exception is not an element of the offense absent a discernible legislative intent to the contrary. And that means such exception need not bear upon an investigating officer's initial determination of reasonable suspicion where the exception's applicability would not be readily apparent to a prudent officer prior to the suspect's seizure. Cf. id. at 1355 ("Where defendants are

11

better equipped to prove facts that would allow them to take advantage of a statutory exception, we ordinarily view that exception as an affirmative defense.").

## B.

At the commencement of their encounter, Officer Munoz knew Defendant was carrying a concealed handgun in his back waistband. Officer Munoz saw the handgun because Defendant was bending over stocking shelves. The only express element of the crime of unlawfully carrying a deadly weapon, as defined in N.M. Stat. Ann. § 30-7-2(A), that Officer Munoz lacked personal knowledge of bore upon the handgun's condition. Was the gun loaded or unloaded? See N.M. Stat. Ann. § 30-7-2(B) (carrying an unloaded firearm does not violate § 30-7-2(A)). But Officer Munoz did not have to be certain the handgun was loaded to justify Defendant's seizure; he only had to reasonably suspect the gun was loaded. See Terry, 392 U.S. at 27. "Probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction." Adams v. Williams, 407 U.S. 143, 149 (1972). Necessarily then, neither does the less demanding standard of reasonable suspicion require such evidence.

A prudent officer under the circumstances confronting Officer Munoz could reasonably suspect Defendant's handgun was loaded rather than waiting to find out, thus providing the officer all the suspicion he needed to seize Defendant based on a violation of § 30-7-2(A). One of the basic rules of gun safety promulgated worldwide is to "[a]ssume every gun to be loaded . . . and treat it accordingly." Int'l

12

Hunter Educ. Ass'n, Firearm Safety: Basic Safety Rules, homestudy.ihea.com/ firearmssafety/01actt.htm (visited December 12, 2013). Moreover, that Defendant's handgun was probably loaded is simply a "common sense conclusion[] about human behavior" that Officer Munoz reasonably could draw from the fact Defendant sought to conceal the gun on his person. Cortez, 449 U.S. at 418. (Defendant has never suggested he was openly carrying the handgun). The principal purpose of carrying a concealed handgun is to assail another or defend oneself. An unloaded firearm serves neither of these purposes well, making the fact that Defendant's handgun was loaded a distinct possibility.[4]

Defendant says that instead of seizing him, Officer Munoz simply should have asked him some questions:

> [T]he officers would have had a sufficient basis to enter the store and engage [Defendant] in an inquiry as to whether he had permission or a

---

[4] The New Mexico Administrative Code provides "a licensee *carrying a concealed handgun* on or about his person in public *shall*, *upon demand* by a peace officer, display his license to carry a concealed handgun." N.M. Code R. § 10.8.2.16(D) (emphasis added). We note Defendant was not a "licensee" because he had no license to carry a concealed loaded handgun. Even assuming, however, that the term "licensee" encompasses any individual carrying a concealed handgun, Officer Munoz, for what it's worth, appears to have complied with that regulation. We have held that although "compliance with state law may be relevant to the court's Fourth Amendment reasonableness analysis, we have never held it to be determinative of the constitutionality of police conduct. Instead, compliance with state law is highly determinative only when the constitutional test requires an examination of the relevant state law . . . ." Swanson v. Town of Mountain View, 577 F.3d 1196, 1203 (10th Cir. 2009) (internal citation and quotation marks omitted). Here, our "constitutional test" requires an examination of N.M. Stat. Ann. § 30–7–2(A) and its exceptions.

13

permit for the gun he was carrying. Had [he] either refused to produce a valid permit or admitted to wrongdoing, the officers at that point might have had reasonable suspicion to detain him to investigate the situation further. But in this case, the officers exceeded their authority under the law and seized [his] weapon with[out] a reasonable suspicion that he was engaging in criminal activity and without an articulable basis to believe he was dangerous in any way.

Def's Op. Br. at 34. (internal citation omitted). We disagree. Although Officer Munoz could have sought to engage Defendant in a consensual encounter, the law did not require him to do so—and for good reason.

Given the confined space in which the parties found themselves at the outset of their encounter, Officer Munoz exercised sound judgment in declining to question Defendant before detaining him. Officer Munoz explained, "I didn't want myself and Officer Miller or [Defendant], all of us, to be in that cramped area in case anything occurred[.]" Tr. vol. 3, at 16. No officer reasonably suspecting criminal activity—as Officer Munoz did here—"should have to ask one question and take the risk that the answer might be a bullet." Terry, 392 U.S. at 33 (Harlan, J., concurring). "The reasonableness of [an] officer's decision to stop a suspect does not turn on the availability of less intrusive investigatory techniques." Sokolow, 490 U.S. at 11. "Such a rule would unduly hamper the police's ability to make swift, on-the-spot decisions . . . and it would require courts to indulge in unrealistic second-guessing." Id. (internal quotation marks omitted).

What Defendant effectively claims is that the law required Officer Munoz to inquire into the applicability of § 30-7-2(A)'s exceptions before seizing him. Of

14

course, Officer Munoz did not know at the outset of their encounter whether Defendant was "in possession of a valid concealed handgun license." N.M. Stat. Ann. § 30-7-2(A)(5). Nor did Officer Munoz know whether Defendant was "an owner, lessee, tenant or licensee" of the convenience store. Id. § 30-7-2(A)(1). That New Mexico excepts certain acts or classes of individuals from a law that bans the carrying of a concealed loaded firearm, however, did not negate Officer Munoz's reasonable suspicion that Defendant's possession of a concealed handgun was unlawful. See Reid, 448 U.S. at 441 (recognizing that "wholly lawful conduct" may give rise to reasonable suspicion). Neither of these exceptions to § 30-7-2(A)'s prohibition was readily apparent when Officer Munoz seized Defendant. Officer Munoz had no affirmative obligation prior to seizing Defendant—at the risk of harm to himself and others—to inquire of him whether his possession of the handgun fell within the classes excepted by the statute. Cf. Gatlin, 613 F.3d at 378 ("[U]nder Delaware law, carrying a concealed handgun is a crime to which possessing a valid license is an affirmative defense, and an officer can presume a subject's possession is not lawful until proven otherwise.").

In the end, Defendant grasps at straws. He says the question of whether an officer may conduct an investigative detention based "solely" on the presence of a concealed firearm "is analogous to the question of whether an officer can pull over any motor vehicle he chooses in order to determine whether the driver is properly licensed and in lawful possession of the car." Def's Op. Br. at 27. We think not.

15

To be sure, any construction of a motor vehicle statute permitting such random stops, however the statute is worded, would be unconstitutional. In <u>Delaware v. Prouse</u>, 440 U.S. 648 (1979), the Supreme Court held the Fourth Amendment prohibits an officer from stopping a vehicle for the sole purpose of checking the driver's license and registration, where neither probable cause nor reasonable suspicion exists to believe the motorist is driving the vehicle contrary to the laws governing the operation of motor vehicles. <u>Id.</u> at 650, 663. The Court reasoned:

> It seems common sense that the percentage of all drivers on the road who are driving without a license is very small and that the number of licensed drivers who will be stopped in order to find one unlicensed operator will be large indeed. The contribution to highway safety made by discretionary stops selected from among drivers generally will therefore be marginal at best. . . . In terms of actually discovering unlicensed drivers or deterring them from driving, the spot check does not appear sufficiently productive to qualify as a reasonable law enforcement practice under the Fourth Amendment.

<u>Id.</u> at 659–60.

Driving a car, however, is not like carrying a concealed handgun. Driving a vehicle is an open activity; concealing a handgun is a clandestine act. Because by definition an officer cannot see a properly concealed handgun, he cannot randomly stop those individuals carrying such weapon. Officer Munoz responded to a dispatch reporting two employees of the convenience store were showing each other handguns. Once at the store, he witnessed Defendant carrying the concealed weapon only because Defendant was bending over and his shirt was untucked. Moreover, unlike the random stop of a motorist, we may safely assume the contribution to

16

public safety made by the stop of an individual known to be carrying a concealed handgun will hardly be insignificant since "[c]oncealed weapons create an immediate and severe danger to the public." Terry, 392 U.S. at 31 (Harlan, J., concurring).

Randomly stopping a vehicle to check the driver's license and registration is more comparable to randomly stopping an individual *openly* carrying a handgun (which incidentally is lawful in New Mexico). The Supreme Court held the former unconstitutional. Whether the latter is constitutionally suspect is a question for another day. But where a police officer in New Mexico has personal knowledge that an individual is carrying a concealed handgun, the officer has reasonable suspicion that a violation of N.M. Stat. Ann. § 30-7-2(A) is occurring absent a readily apparent exception to subsection (A)'s prohibition. Accordingly, Officer Munoz's initial seizure of Defendant was "justified at its inception" and therefore passes Fourth Amendment scrutiny. Terry, 392 U.S. at 22.

IV.

This brings us to the manner in which Officer Munoz carried out Defendant's seizure. Recall Officer Munoz pulled the gun from Defendant's waistband as Defendant was going out the door. Once Defendant promptly acknowledged he did not have a license to carry the handgun, Officer Miller ran the check that reported the handgun stolen. Defendant's sole argument in this regard is that Officer Munoz unlawfully dispossessed him of his handgun as he exited the convenience store which, in turn, permitted Officer Miller to run a check of the gun. See Adams, 407

17

U.S. at 145 (analyzing as a <u>Terry</u> search defendant's contention that the initial seizure of his pistol, upon which the subsequent search rested, was unlawful).

"[T]o proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous."[5]  <u>Johnson</u>, 555 U.S. at 326–27. Defendant acknowledges he was armed, but claims Officer Munoz had no reason to believe he was dangerous.  We have already observed that a prudent officer could reasonably suspect Defendant's handgun was loaded.  That alone is enough to justify Officer Munoz's action in removing the handgun from Defendant's waistband for the protection of himself and others. But even if Defendant's handgun had not been loaded, the Supreme Court's decision in <u>McLaughlin v. United States</u>, 476 U.S. 16 (1986), forecloses his argument that the gun posed no immediate threat to the officers.  In <u>McLaughlin</u>, the Court explained an unloaded handgun is a "dangerous weapon:"

> [A] gun is an article that is typically and characteristically dangerous; the use for which it is manufactured and sold is a dangerous one, and the law reasonably may presume that such an article is always dangerous even though it may not be armed at a particular time or place.

_____

[5]  Oddly, to disarm a "licensee" consistent with N.M. Code R. § 10.8.2.20, a police officer must have "*probable cause* to believe it is necessary for the protection of the licensee, [police] officer or other individual." (emphasis added).  Defendant, of course, was not a "licensee."  Moreover, whether probable cause to disarm an individual for purposes of New Mexico state law equates to reasonable suspicion that a person justly suspected of a crime is armed and dangerous for purposes of the governing Fourth Amendment analysis has no bearing on the outcome here.  <u>See</u> <u>supra</u> n.4.

Id. at 17.

We will not deny an officer making a lawful investigatory stop the ability to protect himself from an armed suspect whose propensities are unknown. See Adams, 407 U.S. at 146. Officer Munoz did no more than was required to retrieve the gun. Officer Munoz was entitled to remove Defendant's handgun, not to discover evidence of a crime, but to permit him and Officer Miller to pursue their investigation without fear of violence. See id. As the Supreme Court observed in Adams, "[T]he frisk for weapons might be equally necessary and reasonable, whether or not carrying a concealed weapon violated any applicable state law." Id. Accordingly, Officer Munoz's act of dispossessing Defendant of his handgun subsequent to his seizure was "reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 20.

For the foregoing reasons, the order of the district court denying Defendant's motion to suppress is—

AFFIRMED.