NIEMEYER, Circuit Judge,
dissenting:
The majority acknowledges that when Captain Robbie Roberts confronted Shaq-uille Robinson following a lawful traffic stop, Roberts had reasonable suspicion to believe that Robinson was armed with a loaded gun concealed in his pocket. Nonetheless, it concludes that Captain Roberts could not have reasonably believed that he was in danger because, for all Roberts knew, Robinson could have been carrying a concealed weapon pursuant to a license issued by West Virginia. The majority reasons that Roberts was required to presume that Robinson was “a law-abiding citizen who pose[d] no danger to the authorities.” Ante at 208. Therefore, it holds, the frisk, which Roberts conducted for his safety and the safety of a fellow officer, violated the Fourth Amendment.
This remarkable holding establishes a new approach that will make traffic stops substantially more dangerous to police officers and that is based, I respectfully submit, on several basic flaws of law and logic. First, the majority’s approach modifies the Supreme Court’s existing criteria for frisks by requiring indicia of dangerousness distinct from and in addition to the danger posed by an individual’s possession of a firearm during the course of a forced police encounter. The majority fails to accept the Supreme Court’s explanation that a reasonable officer need have only a suspicion that the individual who has been lawfully stopped is armed and thus dangerous. See Pennsylvania v. Mimms, 434 U.S. 106, 112, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (per curiam); Terry v. Ohio, 392 U.S. 1, 28, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
Second, the fact that Robinson could have been licensed to carry a concealed weapon does not minimize the danger that prompted the Supreme Court in Terry to authorize protective frisks under the *214 Fourth Amendment. The Supreme Court has explained that the dangerousness justifying the frisk arises from the combination of the police forcing an encounter with a person and that person’s possession of a gun, whether the possession of a gun was legal or not. See Adams v. Williams, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). The frisk authorized by Terry is justified by dangerousness, not by criminal conduct.
Third, in hypothesizing innocence to various isolated aspects of Robinson’s conduct — for instance, that he could have possessed the gun legally and that its possession in a high crime area is consistent with “innocent and non-dangerous gun possession,” ante at 212 — the majority overlooks the Supreme Court’s guidance that “reasonable suspicion need not rule out the possibility of innocent conduct.” Navarette v. California, — U.S. —, 134 S.Ct. 1683, 1691, 188 L.Ed.2d 680 (2014) (internal quotation marks and citation omitted). It also overlooks the totality of the real world circumstances that leaves no doubt that Captain Roberts had a reasonable suspicion that Robinson was armed and dangerous. Not only did Roberts have good reason to believe that Robinson possessed a loaded gun in his pocket, he also had information indicating that Robinson had both loaded and concealed the gun while in a well-known drug market. And Captain Roberts’ suspicion was only heightened when, prior to the frisk, he asked Robinson whether he had a gun and Robinson responded with an “ ‘oh, crap’ look[],” taken by Roberts as indicating that Robinson did not want to deny possession of a gun and thus lie, but also did not want to confess to possessing one.
With the majority’s new approach to what justifies a frisk during a lawful stop, police officers will be confused and their efforts in protecting themselves impaired. Traffic stops, which the Supreme Court has noted are already “especially fraught with danger,” Michigan v. Long, 463 U.S. 1032, 1047, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), will become yet more dangerous as a result. The majority, I am afraid, has forgotten Terry’s fundamental principle that the Fourth Amendment does not “require ... police officers [to] take unnecessary risks in the performance of their duties.” 392 U.S. at 23, 88 S.Ct. 1868.
I respectfully dissent.
I
The facts are not disputed. At about 3:55 p.m. on March 24, 2014, an unidentified man called the Ranson, West Virginia Police Department and told Officer Crystal Tharp that he had just “witnessed a black male in a bluish greenish Toyota Camry load a firearm [and] conceal it in his pocket” while in the parking lot of the 7-Eleven on North Mildred Street. He advised Officer Tharp that the Camry was being driven by a white woman and had “just left” the parking lot, traveling south on North Mildred Street.
The 7-Eleven on North Mildred Street is adjacent to the Apple Tree Garden Apartments, and the area constitutes the highest crime area in Ranson, which itself is a high crime city. One officer who testified said that in his short one and a half years as a state trooper, he experienced at least 20 incidents of drug trafficking in the 7-Eleven parking lot. Another officer testified that “when [she] was doing drug work[,] ... [she] dropped an informant off to buy drugs” at the 7-Eleven parking lot and observed “three other people waiting for drugs in that parking lot.” She added that she had personally received “numerous complaints” of people running between the parking lot and the apartment complex, making drug transactions. Another officer testified that *215 “[a]nytime you hear Apple Tree or 7-Elev-en, your radar goes up a notch.” Accordingly, when the Ranson Police Department received the tip about someone loading a gun in the 7-Eleven parking lot, its officers’ “radar [went] up a notch,” and the officers went “on heightened alert.”
While still on the telephone with the caller, Officer Tharp relayed the information to Officer Kendall Hudson and Captain Roberts. Hudson immediately left the station to respond to the call, and Roberts left soon thereafter to provide backup.
When Officer Hudson turned onto North Mildred Street a short time later, he observed a blue-green Toyota Camry being driven by a white female with a black male passenger. Noticing that they were not wearing seatbelts, Hudson effected a traffic stop at a location approximately seven blocks, or three-quarters of a mile, south of the 7-Eleven. He estimated that the traffic stop took place two to three minutes after the call had been received at the station.
After calling in the stop, Officer Hudson approached the driver’s side of the vehicle and asked the driver for her license, registration, and proof of insurance. He also asked the male passenger, the defendant Robinson, for his identification before realizing that that was “probably not a good idea” because “[t]his guy might have a gun[,] [and] I’m asking him to get into his pocket to get his I.D.” Instead, Officer Hudson asked Robinson to step out of the vehicle.
At this point, Captain Roberts arrived and opened the front passenger door. As Robinson was exiting the vehicle, Captain Roberts asked him if he had any weapons on him. Instead of responding verbally, Robinson “gave [Roberts] a weird look” or, more specifically, an ‘“oh, crap’ look[ ].” Roberts took the look to mean, “I don’t want to lie to you, but I’m not going to tell you anything [either].” At this point, Captain Roberts directed Robinson to put his hands on top of the car and performed a frisk for weapons, recovering a loaded gun from the front pocket of Robinson’s pants. After conducting the frisk, Captain Roberts recognized Robinson and recalled that he had previously been convicted of a felony.
After Robinson was charged with the illegal possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1), he filed a motion to suppress the evidence of the firearm and ammunition seized during the frisk, arguing that the frisk violated his Fourth Amendment rights.
The district court denied the motion, concluding that the officers possessed reasonable suspicion to believe that Robinson was armed and dangerous. Relying on Navarette, 134 S.Ct. at 1688-89, the court concluded that the anonymous caller’s eyewitness knowledge and the contemporaneous nature of the report indicated that the tip was sufficiently rehable to contribute to the officers’ reasonable suspicion. The court explained that the “anonymous tip that [Robinson] [had] recently loaded a firearm and concealed it on his person in a public parking lot in a high-crime area,” when combined with Robinson’s “weird look and failure to verbally respond to the inquiry whether he was armed,” gave rise to a reasonable suspicion that Robinson was armed and dangerous.
Robinson thereafter pleaded guilty to the gun possession charge, reserving his right to appeal the district court’s denial of his suppression motion, and the district court sentenced him to 37 months’ imprisonment. Robinson filed this appeal, challenging Captain Roberts’ frisk under the Fourth Amendment.
*216 II
Robinson’s appeal is defined as much by what he concedes as by what he challenges. Robinson rightfully acknowledges that the Ranson police had the right to stop the vehicle in which he was a passenger after observing a traffic infraction, see Whren v. United States, 517 U.S. 806, 819, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), and also that they had the authority to direct him to exit the vehicle during the valid traffic stop, see Maryland v. Wilson, 519 U.S. 408, 415, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997). He also correctly concedes that the anonymous tip received by the Ranson Police Department was sufficiently reliable to justify the officers’ reliance on it. See Navarette, 134 S.Ct. at 1688-89 (concluding that an anonymous 911 call “bore adequate indicia of reliability for the officer to credit the caller’s account” in large part because, like here, the caller “claimed eyewitness knowledge of the alleged [conduct]” and the call was a “contemporaneous report” that was “made under the stress of excitement caused by a startling event”). Finally, and most importantly, he does not contest the district court’s conclusion that the police had reasonable suspicion to believe that he was armed, surely recognizing that he perfectly matched the caller’s specific description of the individual whom the caller claimed to have just seen with a gun.
Robinson’s argument is that while the officers may well have had good reason to suspect that he was carrying a loaded concealed weapon, they lacked objective facts indicating that he was also dangerous, so as to justify a frisk for weapons, since an officer must reasonably suspect that the person being frisked is both armed and dangerous. Robinson notes, in this regard, that West Virginia residents may lawfully carry a concealed firearm if they have received a license from the State. See W. Va.Code § 61-7-4. Because the police did not know whether or not Robinson possessed such a license, he contends that the tip that a suspect matching his description was carrying a loaded firearm concealed in his pocket was a report of innocent behavior that was not sufficient to indicate that he posed a danger to others.
The majority accepts this argument and, in doing so, adopts its several flaws, both as a matter of law and as a matter of logic. Thus, it establishes a new principle in tension with basic Supreme Court jurisprudence, holding that, “in states like West Virginia, which broadly allow public possession of firearms, reasonable suspicion that a person [lawfully stopped] is armed does not by itself give rise to reasonable suspicion that the person is dangerous for Terry purposes.” Ante at 208. Under the majority’s new standard, a frisk during a traffic stop must be justified by more than suspicion that the person who has been stopped is armed.
The majority achieves this position by dissecting the armed-and-dangerous requirement into two distinct requirements, holding that dangerousness must exist separately and to a greater extent than the danger created by the person’s possession of a gun during a lawful but forced police encounter. Respectfully, this fundamentally twists the Supreme Court’s armed- and-dangerous standard and, in any event, defies common sense.
In Terry, where the Court first authorized a stop and frisk under the Fourth Amendment without probable cause, the Court was confronted with two distinct issues: first, whether a person could be stopped on suspicion of criminal conduct that fell short of probable cause; and second, whether the officer could conduct a protective frisk or “pat down” during the stop. As the Court posed the second issue, “We are now concerned with more *217 than the governmental interest in investigating crime; in addition, there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him.” Terry, 392 U.S. at 23, 88 S.Ct. 1868 (emphasis added). Accordingly, the frisk that the Court ultimately authorized had to be “limited to that which is necessary for the discovery of weapons which might be used to harm the officer.” Id. at 26, 88 S.Ct. 1868. In approving the frisk before it, the Court observed that “Officer McFadden confined his search strictly to what was minimally necessary to learn whether the men were armed and to disarm them once he discovered weapons.” Id. at 30, 88 S.Ct. 1868. The concern — the danger— was thus the presence of a weapon during a forced police encounter. The Court said this explicitly in approving Officer McFadden’s frisk, noting that “a reasonably prudent man would have been warranted in believing petitioner was armed and thus presented a threat to the officer’s safety.” Id. at 28, 88 S.Ct. 1868 (emphasis added). In this fashion, the Court approved the well-known standard that during a Terry stop, an officer can frisk a suspect if the officer reasonably believes that the suspect is armed and thus dangerous, or, in short, “armed and dangerous.”
The Court again relied on this exact understanding in Mimms, where an officer, after making a routine traffic stop, “noticed a large bulge” under the defendant’s jacket and therefore conducted a frisk. 434 U.S. at 107, 98 S.Ct. 330. Holding that the frisk was clearly justified, the Mimms Court explained that “[t]he bulge in the jacket permitted the officer to conclude that Mimms was armed and thus posed a serious and present danger to the safety of the officeradding that “[i]n these circumstances, any man of ‘reasonable caution’ would likely have conducted the ‘pat down.’” Id. at 112, 98 S.Ct. 330 (emphasis added). The only evidence of Mimms’ dangerousness on which the Court relied was the bulge indicating that Mimms was armed. It was thus Mimms’ status of being armed during a forced police encounter (the traffic stop) that posed the danger justifying the frisk.
The armed-and-dangerous appellation is thus a unitary concept, and no further evidence of dangerousness is required to justify a frisk once a police officer reasonably suspects that an individual who has been lawfully stopped is armed. This approach rests on the well-recognized background level of risk attendant whenever police use their authority to effect a stop. This holds true whether the temporary detention is a traditional Terry stop to investigate an officer’s reasonable suspicion “that the person apprehended is committing or has committed a criminal offense,” Arizona v. Johnson, 555 U.S. 323, 326, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009), or a stop to enforce a jurisdiction’s traffic laws, see id. at 331, 129 S.Ct. 781 (“[T]he risk of a violent encounter in a traffic-stop setting ‘stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that evidence of a more serious crime might be uncovered during the stop’ ” (quoting Wilson, 519 U.S. at 414, 117 S.Ct. 882)); see also Mimms, 434 U.S. at 110, 98 S.Ct. 330 (emphasizing that the Court had previously “expressly declined to accept the argument that traffic violations necessarily involve less danger to officers than other types of confrontations”). To be sure, this general risk does not, by itself, justify a frisk, but it is a component background risk such that when an officer suspects that the person he has stopped — a person whose propensities are unknown — is “armed with a weapon,” Terry, 392 U.S. at *218 23, 88 S.Ct. 1868, the officer is “warranted in the belief that his safety ... [is] in danger,” id. at 27, 88 S.Ct. 1868. A Terry frisk is then lawful, with or without any additional signs indicating that the individual may be dangerous. See United States v. Rodriguez, 739 F.3d 481, 491 (10th Cir.2013) (concluding that “an officer making a lawful investigatory stop [must have] the ability to protect himself from an armed suspect whose propensities are unknown” and therefore rejecting the defendant’s argument that the officer “had no reason to believe he was dangerous” even though the officer had seen a handgun tucked into the waistband of his pants).
The cases relied on by the majority miss the mark. They do not concern what justifies a frisk after a lawful stop is made. Their holdings instead relate to whether possession of a gun gives rise to a reasonable suspicion of criminal activity, therefore justifying a Terry stop in the first instance. See United States v. Black, 707 F.3d 531, 540 (4th Cir.2013) (“[W]here a state permits individuals to openly carry firearms, the exercise of this right, without more, cannot justify an investigatory detention” (emphasis added)); Northrup v. City of Toledo Police Dep’t, 785 F.3d 1128, 1133 (6th Cir.2015) (“[T]he Ohio legislature has decided its citizens may be entrusted with firearms on public streets. The Toledo Police Department has no authority to disregard this decision ... by detaining every ‘gunman’ who lawfully possesses a firearm” (emphasis added) (citation omitted)); United States v. Williams, 731 F.3d 678, 692-93 (7th Cir.2013) (Hamilton, J., concurring) (“A Terry stop does not require probable cause for an arrest, of course, but it still requires reasonable suspicion of genuinely criminal conduct. Based on the new Wisconsin law, that is hard to find on. this record”); United States v. Ubiles, 224 F.3d 213, 214 (3d Cir.2000) (“[T]he stop and subsequent search were unjustified because the precondition for a ‘Terry’ stop was not present in this case”). These cases thus have little bearing on the present case, where both Robinson and the majority acknowledge that the police had the right to detain Robinson and the only issue is whether Captain Roberts acted reasonably to protect his safety and the safety of his fellow officer during that encounter. The majority has thus conflated the nature of suspicion for making a stop in the first instance with the nature of suspicion for conducting a frisk during a lawful stop. The first requires a suspicion of criminal conduct, while the latter requires suspicion of weapons possession. It is clear that if the officer has a reasonable suspicion that the person he has stopped is armed, the officer may conduct a frisk.
In sum, established law imposes two requirements for conducting a frisk: first, that the officer have conducted a lawful investigatory stop, which includes both traditional Terry stops as well as traffic stops; and second, that during the valid but forced encounter, the officer reasonably suspect that the person is armed and therefore dangerous. Both were satisfied in this case, thus justifying Captain Roberts’ frisk under the Fourth Amendment as a matter of law.
Also, as a matter of logic, the majority’s position — that because Robinson could have been licensed under West Virginia law to carry a concealed weapon, Captain Roberts could not have reasonably believed that he was dangerous — is flawed. It does not follow that because an individual has a license to carry a concealed weapon, he does not pose a threat to officers’ safety during a lawful but forced police encounter. Indeed, when a person is stopped on the highway for a traffic infraction, that person poses a heightened risk of danger simply by possessing a firearm *219 during the encounter, whether the weapon is possessed legally or not. As the Supreme Court has explained, “The purpose of this limited search [i.e., the frisk] is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence, and thus the frisk for weapons might be equally necessary and reasonable, whether or not carrying a concealed weapon violated any applicable state law.” Adams, 407 U.S. at 146, 92 S.Ct. 1921 (emphasis added). The majority’s position directly conflicts with this, concluding that ... when gun possession is legal, “there is no reason to think that a person carrying or concealing a weapon during a traffic stop is anything but a law-abiding citizen who poses no danger to the authorities.” Ante at 208.
Contrary to the majority’s thesis, nothing about the assumed recent liberalization of gun laws changes the proper analysis. The majority’s analysis rests on the premise that, without some other basis for suspecting danger, an officer can reasonably suspect that an armed individual who has been detained during a traffic stop only presents a threat to the officer’s safety if the stop takes place in a jurisdiction where gun possession is generally illegal. See ante at 210 (“[O]nce state law routinely permits the public possession of weapons, the fact that an individual is armed, in and of itself, is not an objective indication of danger”). But the presumptive lawfulness of an individual’s gun possession in a particular state does nothing to negate the reasonable concern an officer would almost invariably feel for his own safety when forcing an encounter with an unknown individual who is armed with a gun and whose propensities are unknown. See Rodriguez, 739 F.3d at 491.
The final flaw in the majority’s approach is attributable to its focus on isolated, innocent possibilities of Robinson’s conduct — that he could be an innocent citizen carrying a gun as authorized by a lawfully issued license; that he was coincidentally in a high-drug zone; and that he had no legal duty to tell Captain Roberts of any license to carry a gun — and its failure to consider the totality of the actual circumstances presented. To be sure, the observations that the majority makes about the possibilities of innocent conduct in isolated circumstances may be valid, but in the context of the real world circumstances, considered as a whole, they are neither likely nor relevant. As an initial matter, the majority’s analysis completely overlooks the Supreme Court’s recognition that “reasonable suspicion need not rule out the possibility of innocent conduct.” Navarette, 134 S.Ct. at 1691 (emphasis added) (internal quotation marks and citation omitted). Rather, the inquiry must, as the Supreme Court has repeatedly instructed, be based on common sense, see Navarette, 134 S.Ct. at 1690; Illinois v. Wardlow, 528 U.S. 119, 125, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000); Ornelas v. United States, 517 U.S. 690, 695, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996), and must be focused on what a reasonable officer would believe in light of the totality of the circumstances. The majority’s innocent possibilities analysis, by contrast, fails to give due weight to two key facts known to Captain Roberts and the “commonsense judgments and inferences” that Roberts could draw from those facts when taken together. Wardlow, 528 U.S. at 125, 120 S.Ct. 673.
First, the reliable tip in this case was not just that an individual matching Robinson’s description possessed a .gun. Rather, the. caller reported that he had observed an individual “load a firearm [and] conceal it in his pocket” while in the parking lot of the 7-Eleven on North Mildred Street, a location that the officers knew to be a popular spot for drug-trafficking activity. Indeed, at the evidentiary hearing, a state trooper who had been on the force *220 only a year and a half estimated that he had experience with at least 20 incidents of drug trafficking in that particular parking lot. Another officer testified that “when [she] was doing drug work[,] ... [she] dropped an informant off to buy drugs there” and observed “three other people waiting for drugs in that parking lot.” A third officer explained, “[a]nytime you hear ... 7-Eleven, your radar goes up a notch.” Knowing that the 7-Eleven parking lot was frequently used as a site for drug trafficking, a reasonable officer could legitimately suspect that an individual who was seen both loading and concealing a gun in that very parking lot may well have been doing so in connection with drug-trafficking activity. See United States v. Lomax, 293 F.3d 701, 705 (4th Cir.2002) (recognizing the “numerous ways in which a firearm might further or advance drug trafficking”). Thus, that an individual matching Robinson’s description was reported to have recently loaded and concealed a firearm while in a parking lot so well known for its connection to drug activity greatly reinforces the reasonableness of Captain Roberts’ suspicion that Robinson was both armed and dangerous'.
Second, when Captain Roberts asked Robinson, as he was getting out of the car, whether he was carrying any firearms, Robinson gave the officer an “ ‘oh, crap’ look[],” which Roberts took to mean, “I don’t want to lie to you, but I’m not going to tell you anything [either].” Surely, this was not the reaction of a person who legally possessed a concealed weapon for a benign purpose. In other words, Robinson’s response to Captain Roberts’ question not only confirmed Roberts’ suspicion that Robinson had a concealed weapon, it also made it eminently reasonable for Captain Roberts to suspect that Robinson’s possession of a concealed weapon was illegal and dangerous. See W. Va.Code § 61-7-3 (making it a crime to carry a concealed deadly weapon without a license or other lawful authorization). That West Virginia does not impose a legal duty on those licensed to carry concealed weapons to report their gun possession when stopped by police does not obviate Captain Roberts’ suspicion, based on common sense, that Robinson’s silence was telling.
At bottom, the fact that Captain Roberts reasonably suspected that Robinson, who had been detained pursuant to a valid traffic stop, was armed and thus dangerous fully supports the legality of the frisk. But even beyond that, a proper consideration of the totality of the circumstances presented here — the information provided by the reliable tip, the lawlessness prevalent at the relevant location, and Robinson’s incriminating reaction during the traffic stop — establishes, beyond doubt, that Captain Roberts’ belief that Robinson was armed and dangerous was reasonable and that a protective frisk of Robinson’s person during a valid stop was therefore warranted. “In these circumstances, any man of ‘reasonable caution’ would likely have conducted the ‘pat down.’ ” Mimms, 434 U.S. at 112, 98 S.Ct. 330.
With an analysis that finesses the context that supported the officers’ suspicions, the majority reaches a highly abstract result because “times have changed,” ante at 207, and officers must allow that everyone can possess a gun during a traffic stop absent other indicators of dangerousness. But, in light of all the circumstances known to Captain Roberts, I submit that Roberts would unquestionably have been criticized for not having taken reasonable precautions if, after failing to conduct a frisk, something untoward had happened.
I would affirm the district court’s denial of Robinson’s motion to suppress, which was undoubtedly correct.